CONTINENTAL BUS SYSTEM, INC., et al.,
Appellants,

v.

Mrs. Patricia BIGGERS et al., Appellees.

Betty Jo Epps GROSS et vir, Appellants,

v.

Mrs. Patricia BIGGERS et al., Appellees.

Nos. 12814 and 12840.

Court of Civil Appeals of Texas.
Houston.

Feb. 26, 1959.

Rehearing Denied March 19, 1959.

**2**

·Chilton Bryan, Houston, and Strasburger, Price, Kelton, Miller & Martin, and Hobert Price, Dallas, for appellant Bus System.

Hall E. Timanus and Robert L. Bradley, Houston, for Betty Jo Epps Gross and

husband. Andrews, Kurth, Campbell & Bradley, Houston, of counsel.

Butler, Binion, Rice & Cook, W. N. Blanton, Jr., Houston, for appellee Commercial Standard Insurance Co.

Pepper & Markward, Robert C. Pepper and Forrest Markward, Ft. Worth, and Hart, Brown, Sparks & Erwin, and James P. Hart, Austin, for appellees Mrs. Biggers and her three minor children.

Hamblen & Bobbitt, and Karl E. Kraft, Houston, for appellees A. H. Lightfoot, P. E. Furlow, K. K. Kellam and Basil S. Roper, d/b/a Texas Motors.

BELL, Chief Justice.

This is a case in which appellees, Mrs. Patricia Biggers and her three minor children recovered judgment for $101,080 against appellants, Continental Bus System, Inc., herein called Bus Company, and Betty Jo Epps Gross, herein called Mrs. Gross. The damages as found by the jury accrued to them as a result of the death of the husband and father, E. A. Biggers, Jr., his death being brought about by a collision between a bus of Continental and an automobile in which Biggers was riding.

The jury found the agent of the Bus Company to be negligent in the following respects:

1. In failing to keep a proper lookout.

2. In driving at an excessive rate of speed.

3. In driving at a speed in excess of 55 miles per hour.

4. In failing to apply brakes.

The jury found each act of negligence to be a proximate cause of the collision.

When the case was originally submitted to this Court, the Court, as then constituted, held there was no evidence of probative value supporting the jury's findings that these acts of negligence were proximate causes of the collision and judgment

was reversed and rendered in favor of the Bus Company. Judgment, however, was affirmed as to Mrs. Gross. Her liability was predicated on other acts of negligence unrelated to those of the Bus Company. Tex.Civ.App., 277 S.W.2d 228. The Supreme Court granted Mrs. Biggers' application for writ of error and granted Mrs. Gross' application because of the granting of Mrs. Biggers'. On original disposition, the Supreme Court (Chief Justice Hickman not sitting) affirmed the action of this Court. Associate Justices Calvert, Walker and Smith dissented. Motion for rehearing was overruled. 298 S.W.2d 79. On a second motion for rehearing being filed, that Court set aside its former judgment, the Court holding there was evidence of probative value showing speed to be a proximate cause of the collision. Associate Justice Griffin dissented and Chief Justice Hickman did not sit. 303 S.W.2d 359. The Court agreed with this Court in its affirmance of the judgment as to Mrs. Gross. The Court did not in its final opinion discuss whether there was evidence raising the issue as to proximate cause as related to failure to keep a proper lookout and failure to apply brakes, but limited their express action to speed as a proximate cause. The Supreme Court has remanded the case to this Court to pass on Point of Error Eleven and other points not previously passed on. The "other points" relate to the rejection of testimony and counsel's argument.

Point Eleven reads as follows:

"The error of the Trial Court, assuming that the Bus Company was not entitled to judgment as a matter of law, in refusing to set aside the jury's verdict against it on the ground that such verdict was so totally and wholly against the great weight of the evidence as to be clearly wrong."

As will be observed, this point raises the question of whether the jury's findings of proximate cause, in so far as speed, failure to keep a proper lookout, and failure to apply brakes are concerned, are so against

**4**

the overwhelming weight and preponderance of the evidence as to be clearly wrong. 303 S.W.2d 359, 368. In its original disposition of this appeal the majority opinion of the Supreme Court concluded, as did this Court, that there was no evidence to show that the failure to keep a proper lookout was a proximate cause of the collision. The dissent also found the absence of evidence to show failure to keep a proper lookout.

We adhere to our original holding that there is no evidence to show failure to keep a proper lookout was a proximate cause of the collision. This holding encompasses the finding that the jury's answer of proximate cause is so against the overwhelming weight and preponderance of the evidence as to be clearly wrong. Barker v. Coastal Builders, Inc., 153 Tex. 540, 271 S.W.2d 798.

While the Supreme Court did not expressly hold that there was evidence sustaining the jury's finding that failure to apply brakes was a proximate cause, we feel that the discussion of the Court was such as to find there was some evidence of probative value to support such finding, and we will, therefore, pass on whether the jury finding in this regard is against the overwhelming weight and preponderance of the evidence. The issues of failure to apply brakes and excessive speed are interrelated.

This Court has the power to find facts by virtue of Rules Nos. 451, 453 and 455, Texas Rules of Civil Procedure, and Article 5, Sec. 6 of the Constitution, Vernon's Ann. St. By virtue of this it has the power to set aside a jury verdict and remand the case for retrial, if a consideration of all of the evidence in the record shows the jury verdict is so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust. We must consider all evidence, that which supports the verdict and that which militates against it. King v. King, 150 Tex. 62, 244 S.W.2d 660; Dyer v. Sterett, Tex.

Civ.App., 248 S.W.2d 234. The test by which we are to be governed in the exercise of our fact-finding power is not a precise one. Some courts have said the overwhelming weight and preponderance of the evidence must be so against the verdict as to make the verdict clearly wrong. Others have said the verdict must be so against the overwhelming weight and preponderance of the evidence as to make the verdict manifestly unjust. At least one authority has said the duty and power to disturb the verdict exists only where the evidence is such as to make the verdict shocking to the conscience. Thompson v. Quarles, Tex.Civ.App., 297 S.W.2d 321, n. r. e. To be sure, we cannot merely substitute our judgment for that of the jury merely because we would have reached a different conclusion on the facts. Dyer v. Sterett, supra. Actually these expressions probably mean the same thing, but as a practical matter they are but an injunction against our substituting our judgment for a jury's except in extraordinary situations.

Our findings of fact are final and binding. Article 5, Sec. 6, Constitution of Texas.

While it is our duty to set aside the verdict of the jury if we believe a consideration of the entire record is so against the overwhelming weight and preponderance of the evidence as to be clearly wrong, unjust, or shocking to the conscience, we should exercise such restraint that we be not in fact guilty of merely substituting our judgment for that of the jury, while professing not to do so. In the exercise of our fact-finding power in this regard, since the test is so imprecise and our finding of fact is final, we should not forget that, to paraphrase an expression of the late Chief Justice Harlan Fiske Stone, the only real restraint on our exercise of this power is our sense of self-restraint.

We have reached the conclusion that the jury findings that excessive speed and failure to apply brakes each were a

proximate cause of the collision which resulted in the death of E. A. Biggers, Jr., are not so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust, clearly wrong, or shocking to the conscience. In fact, we are impressed that the evidence could not be said to heavily preponderate either way.

We will now review the testimony of the witnesses to the collision.

The witness Charlie Mitchell was called by the plaintiff. He drove a gasoline transport truck for C & R Transport Company. He stated the collision occurred about 10 miles north of Huntsville shortly before 9 o'clock a. m., December 20, 1951. He was hauling a load of gasoline from Houston to Fort Worth. The bus, driven by appellant's agent, Jack Lanham, passed his truck about ¾ths of a mile from the place of the collision. At such time the witness was just at the top of a hill beginning to come downhill. Later the witness measured the distance with his speedometer and found the distance to be ⁷⁄₁₀ths of a mile. He noticed the bus come up behind him and motioned it to go by. When the bus passed, the truck was going 45 miles per hour. About half way down the hill the truck was making 50 miles per hour and the bus had spread the distance between it and the truck. The bus at a time just after it passed the truck was going 20 to 25 miles per hour faster than the truck. Just prior to the collision the bus was making 60 to 65 miles per hour. The view down the road in front of the bus was clear and unobstructed. As the witness came down the hill, going north, he saw three automobiles coming south. Visibility was good, but it had been raining and the pavement was wet. The shoulders to the road were muddy. The first car was an old one (Hudson), the next was a Ford (the one occupied by the deceased), and the third was a Chevrolet (occupied by Mrs. Gross). The Ford came out to its left slightly as if to pass and then dropped back behind the Hudson on its side of the highway. At this time the Ford was 175 to 200 feet north of the point of the collision. Mr. Mitchell looked at his instrument board, looked up and saw the Ford come across in front of the bus and saw the collision. As the bus was proceeding down the hill before the collision, it was increasing its speed and continued to do so up to the point of the collision. On cross-examination the witness testified the bus was at all times traveling on its side of the highway until after the collision. At the time the Ford came out in front of the bus the last time, it was 150 to 175 feet in front of the bus. Counsel for appellant introduced impeaching evidence that the witness had previously stated the bus was going 40 to 50 miles per hour and that the bus was not going over 55 miles per hour. Too, impeaching evidence was introduced that the witness previously said he did not see the accident. Also, evidence was introduced that the witness had previously stated the Ford cut out in front of the bus about 15 feet away. He repeated, on cross-examination, the Ford was 150 to 175 feet ahead of the bus when the Ford swerved out. He stated the Ford was about 15 feet behind the Hudson when it pulled out. At another point he reiterated that the bus was going 20 to 25 miles per hour faster than he was. The witness testified he did not see the Chevrolet hit the Ford from behind. (Other testimony shows this is what happened).

Jack Lanham, the bus driver, testified both by deposition and personally. The appellees first introduced parts of his deposition as testimony of an adverse witness. He testified the pavement was wet as it had been raining. The shoulders of the road were muddy. Visibility was good. North of Huntsville he passed two gasoline trucks. He was traveling in a northerly direction. Ahead of him the highway was straight and he could see northward a long distance. He could see about ½ mile from the south to the bridge over Nelson Creek to the north. From ½ mile south of the bridge to the bridge is a downhill grade. He first saw the Hudson, Ford and Chev-

rolet as he came over the hill ½ mile south of the bridge. The Hudson was quite a way down the hill (the hill north of the bridge), and then came the Ford and Chevrolet fairly close together, going at about the same speed. He continued at his same rate of speed. He never put on his brakes at any time from such half-mile point, not even at the time of or immediately before the collision. He stated the collision occurred 50 to 75 feet north of the bridge (measurements taken show the point was 138 feet north of the bridge). From the time he saw the three cars to the north, he continued to watch them. The road was wet enough to be slippery. The bridge was 75 to 80 feet long (actual measurement shows it to be 200 feet long). He got off of the bridge to the north as the Hudson started to cross it. At the time he first saw the vehicles, the Ford was about 400 feet behind the Hudson, and the Chevrolet was about 200 feet behind the Ford. The Hudson was about ½ mile north of the bridge when he first saw it, probably a little less, about ⁴⁄₁₀ths of a mile. The Hudson, when he first saw it, was traveling at a speed of 45 to 50 miles per hour. The Ford, at this same time, was traveling at 60 to 65 miles per hour, overtaking the Hudson. The Chevrolet was going about the same speed as the Ford. The Hudson slowed down 200 to 300 feet from the bridge. When the bus was 75, 80 or 100 feet from the Hudson, the Hudson was going 15 to 20 miles per hour. He was just starting to cross the bridge. At another point in his testimony, he stated he was about 200 feet from the Hudson when it slowed to 15 or 20 miles per hour. The Ford was then 150 to 200 feet behind the Hudson when the Hudson began to reduce its speed. The driver of the Hudson had reduced his speed to 15 to 20 miles per hour about 50 feet from the bridge. It took the Hudson about 50 or 75 feet to reduce its speed. At the time the bus passed the Hudson the driver of the Hudson hit his brake pretty hard and slowed abruptly, and the Ford, with more speed, came up pretty rapidly. It was 15

or 20 feet behind the Hudson. As the bus was at the south end of the bridge, the Ford was slowing down with the Hudson. The Ford had its brakes on. The Ford never hit the Hudson. The Chevrolet at this time was pretty close to the Ford. "It all come bunched down close together." The Chevrolet was from 15 to 20 feet behind the Ford. He never observed any contact between the Ford and Chevrolet. At this time the Hudson was 65, 70 or 75 feet from the bridge. As he crossed the bridge, he was going between 50 and 55 miles per hour, "To be exact, 54 miles." He, after the accident, did not put on his brakes because he was knocked out of his seat by the collision. A few seconds before the car cut out in front of him, he swerved to the right. He swerved 15 or 20 feet before the point of accident. The Ford came out in front of him 15 to 20 feet away. This is an estimate; it could have been a greater distance. At the time the Ford cut out, the back of the bus was about 20 feet off the north end of the bridge. The bus is 36 feet long. The Ford cut out in a southeasterly direction. The Ford was then 15 or 20 feet behind the Hudson. The front end of the bus collided with the right front side of the Ford, from the right front wheel to the back of the single door of the Ford. The left wheel of the bus went up on the Ford and dragged the Ford a distance of about 125 feet. (Actual measurement showed 145 feet). He stated that at the time the Ford started over to his side of the road, the Chevrolet was 25 or 30 feet behind it. He never did see the Chevrolet come in contact with the Ford. (Undisputedly, from other sources, there was contact). After the Ford turned out, it traveled 12 to 15 feet from west to east and traveled 40 to 50 feet south. The Ford turned out at an angle of about 45 degrees. This testimony came from Lanham's deposition. Lanham testified also in person. The Ford turned out in front of the nose of the bus. The back end of the bus was just clearing or had just gotten off the end of the bridge. (The bus was 36 feet long). The Ford was 15 to 20 feet from the bus

when it turned in front of him. (Other testimony showed the collision occurred 138 feet north of the bridge). The right front half of the Ford was hit by the front center of the bus. The Ford was 4 or 5 feet east of the center line at the time. The engine of the bus "conked" out when the collision occurred. When he first saw the cars approaching he was 350 to 400 feet from the bridge. (In his deposition he had said ½ mile). He first saw the Hudson slow down 300 to 400 feet north of the bridge. The driver of the Hudson slowed down pretty fast. When the Hudson slowed down to 15 to 20 miles per hour, he was just starting onto the bridge. The Ford was pretty close to the Hudson, about 100 feet back. The Chevrolet was about 75 feet back. At the time the Hudson started slowing down it was about 300 feet north of the bridge. When the Hudson had slowed down to 15 to 20 miles per hour, it was 100 feet north of the bridge and the Ford was 25 to 30 feet back of the Hudson. The Chevrolet was about 15 feet back of the Ford. He was still away from the south end of the bridge though he was closer than 300 or 400 feet. A gouged-out place on the highway at the point of collision was 3 or 4 feet west from the east edge of the pavement.

At one point Lanham testified he swerved his bus a few seconds before the car cut out in front of him. At another point he testified he was watching the cars. They were quite a distance down the road and he couldn't tell whether they were riding bumper-to-bumper or ten feet apart or two or three feet apart. At another point he testified he saw the driver looking into his rear-view mirror, turned and looked out the side. This was about the time the Ford turned out.

Mrs. Gross was the driver of the Chevrolet automobile that hit the Ford from the rear, causing it to run across to the east lane of traffic. She testified that as a rule she drove from 50 to 60 miles per hour on the highway. (Other testimony showed she and the Ford, as they were coming

down toward the bridge and when first seen by the bus driver, were going 60 to 65 miles per hour). She later testified she didn't know how fast she was driving but it was in the neighborhood of 50 to 60 miles per hour. She first observed the Ford ahead of her as she came around the curve north of the bridge. She did not know how far the curve was from the place of the collision. She said she was just no judge of distance. After she came around the curve she was slowly reducing her speed. Thereafter, until just before the collision, she maintained a speed of about 45 miles per hour. When she applied her brakes she was about half way between the bridge and the curve. The car should have stopped but the brakes locked. She could not saw how far she was back of the Ford at that time. She was gaining rapidly on the car (Ford) in front of her. That was why she had to put on the brakes. The brakes locked and she skidded into the Ford. When she actually hit the Ford she couldn't have been going over 5 or 10 miles per hour.

She noticed the bus coming from the south as she rounded the curve. That was the last time she looked at the bus. She had no idea how far it was away, but it was south of the bridge. There was another car in front of the Ford. *Her car hit the Ford; she shut her eyes, then opened them, and turned off the ignition; turned to see if her companion, Mrs. De Jernett, was all right; and then she heard the crash which was the collision between the Ford and the bus. She asked her companion if she was all right and she answered that she was.* (On cross-examination appellants' counsel, in trying to get an estimate of the time between the time she hit the Ford and the collision, snapped his fingers. How many times the first time he did so is not shown). Mrs. Gross testified the time was slower than the time taken to snap counsel's fingers. Then counsel snapped his fingers three times and Mrs. Gross said the time between the two collisions was more than that.

Testimony from other sources than the above witnesses showed the paved portion of the road to be 24 feet, except on the bridge which was 28 feet, wide.

A tachometer, which records speed, was on the bus. It, according to the interpretation of it by an expert, showed the bus was going 53 miles per hour at the time of the collision. Then occurred an abrupt stop and the tachometer registered up to about 65 miles per hour. The line left on the chart shows an abrupt rise. The expert explains this as being the result of the force of the collision.

Mr. Phelps was the driver of the Hudson automobile. He was driving south toward Huntsville. He was going fishing. When the accident occurred he was just a few feet north from the bridge over Nelson Creek. He had slowed down to look at the creek to see if he could go fishing there. From the time he got on the highway until just before he got to the creek, he was going 20 to 25 miles per hour. He slowed to 10 or 15 miles per hour. He first saw the bus when it was going down the hill toward the bridge. It was a few hundred yards away. He never saw the cars behind him until after the wreck.

■ Proximate cause consists of the elements of foreseeability and causation. Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352; Biggers v. Continental Bus System, Tex., 303 S.W.2d 359. As held by the Supreme Court in this case, under the facts of this case we think there can be little question that the driver of the bus should have reasonably foreseen that one of the automobiles approaching him from the north might in some way get into his lane of traffic and that the speed he was going would be a factor in determining whether or not he could avoid a collision. From the time the driver came over the hill about half a mile south of the bridge he had the vehicles in his view. He saw the Ford and Chevrolet traveling from 60 to 65 miles per hour overtaking the Hudson which was, according to most testimony, traveling at a speed of 45 to 50 miles per hour. He saw the distance between them being closed. He saw the Hudson slow down. Charles Mitchell said he saw the Ford pull out to the east lane of traffic and pull back. The driver denies this. The driver, however, does say when he was some distance away he saw the automobiles close together but could not tell whether they were riding bumper-to-bumper, ten feet apart or 2 or 3 feet apart. This certainly was a danger signal. When Charlie Mitchell saw the Ford come out of its lane of traffic and then drop back, it was about 175 to 200 feet north of the point of collision. Mitchell then looked at his instrument panel; looked up, and saw the Ford again crossing into the left lane of traffic. It could well be that just as the Ford returned to its lane of traffic the Chevrolet hit it and propelled it forward. Certainly, the automobiles were closely grouped. The jury might have well concluded this. In view of the evidence, examined in the light of common experience, we cannot say such conclusion would be clearly wrong, manifestly unjust or shocking to the conscience. When, according to some of the testimony of the bus driver, the Hudson slowed down to 15 or 20 miles per hour, the bus was 200 feet from the Hudson and the Ford was 150 to 200 feet back of the Hudson. This should have been a danger signal because the Ford was overtaking the Hudson. When the bus was at the south end of the 200 foot long bridge the Ford had its brakes on, according to the bus driver. The position of the Ford north of the bridge at this time is not stated. However, this should have been further notice to the driver that the Ford might not be able to slow sufficiently to stop short of the Hudson which it had consistently been nearing since it came around the curve about 9/10ths of a mile away. Too, the driver knew the pavement was wet and slippery, and the shoulders of the road were muddy. These factors all figure in the appraisal a person should make in determining the possibility that overtaking cars might find it neces-

.sary to get over into the other lane of traffic. At no time did the driver put on his brakes or otherwise decelerate his speed.

We cannot say that under these facts the jury's determination that the bus driver should have reasonably foreseen that the Ford might get into the east lane of traffic is clearly wrong.

As to the element of causation, we have also concluded that we cannot say the jury's verdict is clearly wrong, manifestly unjust or shockng to the conscience.

Mr. Lanham, the bus driver, testified that the Ford, after it entered his lane of traffic, traveled from 40 to 50 feet south and 12 to 15 feet from west to east. He also tcxtified that the Ford came into his lane when he was 15 or 20 feet away. This last statement could not have been accurate because other evidence including the pictures show this not to have been a head-on collision. The left wheel of the bus was about the center of the right side of the Ford and rested up on the Ford. There was evidence showing the Ford, behind the Hudson, had slowed down and was going 10 or 15 miles per hour. The jury could well have considered the Ford was going 10 miles per hour. As said by the Supreme Court, if the Ford was traveling 10 miles per hour and traveled 12 to 15 feet from west to east, which is corroborated by the location of the gouged-out place on the concrete, and 40 to 50 feet south, the Ford covered a distance of 52.3 feet. Traveling at 10 miles per hour the Ford was covering 14.65 feet per second. It would thus have taken the Ford about 3½ seconds to travel this distance. The bus, if it were traveling 65 miles per hour, would cover about 95 feet per second, so from the time the Ford entered the east traffic lane to the time of collision, the bus would have traveled 332 feet.

In addition to the above, however, there is other evidence that the Ford entered the east lane of traffic more than 3½ seconds before the collision.

When Mrs. Gross testified she said that when her car hit the Ford she shut her eyes, opened them, reached over and turned off the ignition and asked her companion if she were all right. No exact time required for this is shown. However, it is shown that counsel for appellant snapped his fingers three times in an effort to determine the time lapse and Mrs. Gross said it was longer than that. How long this took, we do not know because the time is not shown, but the jury observed this and could judge. If the bus had been going 40 miles per hour, there would have been 5½ seconds for the Ford to clear the highway and the collision would not have occurred. If the bus had been going 45 miles per hour, the Ford would have had 5 seconds to clear the highway and the accident would not have occurred. The jury did not find what it considered an excessive rate of speed under the circumstances. However, we are of the view that in the light of the condition of the road, the weight of the bus and the fact that three cars were approaching, two of them quickly overtaking the first car, a finding that 40 or 45 miles per hour was a reasonable rate of speed would find ample support in the evidence. The driver himself testified when the cars were some distance down the road he saw them closely bunched. He couldn't tell whether they were riding bumper-to-bumper or ten feet apart or 2 or 3 feet apart. This should in reason have been a warning to him to slow down. He was then at such a distance that he could have put on his brake to decelerate his speed or take his foot off of the accelerator. He did neither. We cannot say just how far he was away because his own testimony is conflicting. However, at one point in his testimony the bus driver testified he first saw the Hudson slow down when it was 200 to 300 feet north of the bridge. He does not say just where he was but we gather from other testimony he was south of the bridge. The bridge was 200 feet long so that when he first saw the Hudson begin to slow he was at least 400 feet away and possibly 500. No rate of deceleration for the bus is given. However, if he was going 54 miles per hour as he said, or even the 60 to 65 es--

timated by Mitchell, which we are not particularly impressed with, we think the jury in the light of common experience could conclude that had the driver applied his brakes he could have slowed to a speed that would have permitted the Ford to get off of the pavement.

We feel the jury was warranted by the evidence in concluding that the failure to apply the brakes and excessive speed substantially contributed to the collision. This is all that is necessary to establish legal causation.

Appellant complains of the action of the trial court in excluding testimony concerning an experiment that was made at the scene of the accident. The experiment was made in 1954. The purpose was to reproduce the road conditions of December 20, 1951; to have a bus like the one involved in the accident driven at various speeds and off the highway at the angle the bus took after the collision in 1951; to take the measurements of distance traveled by the bus and then have an expert engineer testify as to the speed the bus was making at the time of the collision.

We need not notice the details of the testimony offered. We think it sufficient to say that about 4,000 gallons of water were dumped on the shoulder of the road to simulate the conditions of December 20, 1951. There was testimony that the soil conditions were substantially the same as December, 1951, but there was a little more grass on the shoulder. There was testimony that the tire marks or ruts made in the tests were substantially the same as the ruts made by the bus after the accident. However, no measurements were made of the depth of the ruts after the accident, though an officer who observed the ruts on each occasion testified they were substantially the same. The measurements taken were from the point the bus left the highway to the point where it stopped. The person who drove the bus released his foot from the accelerator but

the engine continued to run until the bus stopped. From this information, together with calculations made to allow for the resistance caused by the dragging of the Ford under the bus, the expert was to testify as to the speed. His testimony, given on the bill of exception, was that the bus at the time of the collision was going 50⅛ miles per hour. It is to be noted that the expert's opinion was based on some assumed facts not in evidence. Some of these are: the weight of the bus, the weight of the occupants, the assumed speed of 40 miles per hour for the Ford, and the amount of material gouged out of the concrete pavement. The expert admitted error in assumed facts would affect his determination of speed, though he said it would be small. We have not detailed all the matters that we think the Court could base exclusion upon. We have merely given a few to demonstrate the trial court could well be of the view that the inaccuracies or, at least, the admitted absence of proof in evidence of accuracies, made the testimony inadmissible. Too, the expert stated some of the alleged facts upon which he based his conclusions he got from sources not in evidence.

■ The trial court has a great deal of discretion as to whether the conditions testified about are so substantially similar as to make the proffered testimony admissible. In the case of Navajo Freight Lines, Inc. v. Mahaffy, 10 Cir., 174 F.2d 305, 309, the Court said:

"Navajo next complains of the exclusion by the court of proffered testimony with respect to the results of experiments conducted shortly before the trial designed to show that a car parked on the filling station grounds where the witnesses stated that the Mahaffy car was parked would coast, after some movement causing the car to start, onto the highway between the filling station and the bridge if the emergency brake was released and the car was not in gear. This evidence was rejected by the court upon

the grounds that an adequate showing had not been made that the conditions were substantially the same when the experiments were made as existed at the time of the accident, and that such evidence would tend to confuse the jury.

"The party offering evidence of out-of-court experiments must lay a proper foundation by showing a similarity of circumstances and conditions. The admission of experimental testimony is a matter resting largely within the discretion of the trial court. Beckley v. Alexander, 77 N.H. 255, 90 A. 878; National Pressure Cooker Company v. Stroeter, 7 Cir., 50 F.2d 642; Collins v. Graves, 17 Cal.App.2d 288, 61 P.2d 1198. As stated by the court in Hisler v. State, 52 Fla. 30, 42 So. 692, 695:

" ' * * * Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused. In many instances, a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and make it harmful, rather than helpful.' "

In Reed v. Barlow, Tex.Civ.App., 157 S.W.2d 933, 935, the court said:

"The settled rule is that while a duly qualified expert witness may give his opinion based upon sufficient relevant facts, such facts must be within his personal knowledge, or assumed from common or judicial knowledge, or established by evidence; his opinion is without value, and is inadmissible, if based upon facts and circumstances gleaned by him from ex parte statements of third persons, and not established by legal evidence before a jury trying the ultimate issues to which the opinion relates. 20 Am.Jur. p. 661,

§ 787; 19 Tex.Jur. p. 444, § 290; McCormick & Ray, § 632; Annotations in 98 A.L.R. 1109; Kerr v. Dorchester, Tex.Civ.App., 93 S.W.2d 758; Fidelity Union Casualty Co. v. Dapperman, Tex.Civ.App., 47 S.W.2d 408; Spence v. National Life & Accident Ins. Co., Tex.Civ.App., 59 S.W.2d 212; Anderson v. Caulk, Tex.Civ.App., 5 S.W.2d 816, affirmed 120 Tex. 253, 37 S.W.2d 1008."

See also Long v. Galveston Electric Co., Tex.Civ.App., 59 S.W.2d 228.

■ We are of the view that the court did not abuse his discretion in excluding the testimony.

■ Further it is to be noted that appellant's bus driver testified he was going 54 miles per hour and the highway patrolman testified that after the collision the driver told him he was going 53 miles per hour. Too, the tachometer introduced by appellant shows the bus was going 54 miles per hour. In the light of this testimony from sources vouched for by appellant, we fail to see how the exclusion of the testimony could have possibly been harmful to appellant.

Appellant asserts the trial court erred in overruling its objection to Special Issue No. 78, Subdivision (b), reading as follows:

"The present cash value, if any, of the services, if any, which you find and believe from a preponderance of the evidence that deceased Enoch A. Biggers, Jr., would in reasonable probability have rendered to the minor Plaintiffs in their education, advice and training * * *"

The objection was that there was not even a scintilla of evidence supporting or warranting the submission of the issue.

The evidence showed the father took interest in his children. He taught them sports and he took them to Sunday School.

He was devoted to them and spent as much time as possible at home with them.

■ ■ The rule is well established that the minor children may recover the value of the services which the father in reasonable probability would have rendered them in training, advising and educating them. Texas & Pac. Ry. Co. v. Riley, Tex.Civ.App., 183 S.W.2d 991, writ ref.; Hines v. Mills, Tex.Civ.App., 218 S.W. 777, writ dism.; International & G. N. Ry. Co. v. McVey, 99 Tex. 28, 87 S.W. 328; Texas Power and Light v. Bird, Tex. Civ.App., 165 S.W. 8, error ref.

We think the charge authorized just that and nothing more.

■ There was no error in permitting the appellees to use a blackboard before the jury on which suggested answers were written, which board was used during counsels' argument. So long as it appears (and it does so appear here) that these are suggested answers based on the testimony, there is no error. Ft. Worth & D. C. Ry. Co. v. Kiel, Tex.Civ.App., 195 S.W.2d 405, n. r. e.; Dallas Ry. & Terminal Co. v. Bankston, Tex.Com.App., 51 S.W.2d 304; Pegues v. Dilworth, Tex.Com.App., 134 Tex. 169, 132 S.W.2d 582; Triangle Cab Co. v. Taylor, 144 Tex. 568, 192 S.W. 2d 143; and T. & N. O. Ry. Co. v. McGinnis, Tex.Com.App., 130 Tex. 338, 109 S.W.2d 160.

Of course, counsel may not tell the jury the effect of their answers.

Appellant cites the case of Wichita Transit Co. v. Sanders, Tex.Civ.App., 214 S.W.2d 810, 814, no writ history, as holding the above procedure to be error. We do not so interpret the case. There the court said counsel "made frequent references, during his argument, * * * showing the issues *and the answers he desired to be made* * * *" (emphasis added). Apparently the argument was made without reference to the testimony in the case, but the argument was that it was counsel's

desire that the questions be answered as shown on the blackboard.

■ While we are confident there was no error in the use of the blackboard in the manner stated, we fail to see what possible harm resulted to appellant. There were 79 issues submitted. As we read the record, the jury answered 10 of the issues against appellee. The jury did not well obey appellees' counsel's injunction on how to answer the issues. This evidences a verdict by the jury based on their analysis of the testimony.

■ One of counsel for appellee, in closing his argument, used this language:

"* * * if I should be taken away from my family and if my death should be the result of the negligence of another, I only hope my boys when they came into a court room that they would behave as good and show as much regard for their mother as these three boys."

Objection was made that counsel was not sworn as a witness and this is not sworn testimony and is irrelevant, immaterial, prejudicial and inflammatory. The record reflects that the children, as plaintiffs, were in the court room during the trial for the jury to observe. The family picture was in evidence and testimony and pleading showed deceased left the three sons. We rather view the argument as proper because one of the issues involved what amount the children would lose because of the loss of their father's advice and training. Their behavior, thus observed and described, is itself evidence, that while he was yet with them he must have done a pretty good job in training them.

■ Objection was also made to this argument of one of appellees' counsel:

"'And from the other end of the line, working on the extra board for this bus company, coming on up through the weather, as bad as it was,

and he came over the hill, the highway was ahead of him. And his imp*use* was to get going and get on to Madisonville. He was going down hill, alone in the bus, and he accelerated the bus as he saw these other cars coming, and urged it on with a determination to beat them across the bridge. It was a narrow bottleneck of a bridge, the highway was wet and slippery and his whole purpose was to get across the bridge before the others got there. If a more experienced man than he had been driving the bus, he might have had a little more courtesy, for courtesy is, after all, a standard of care (interrupted)'"

The ground of the objection was that it was an effort to set up a different standard of care or different yardstick than the court set up, and it was highly prejudicial, inflammatory and improper. The basis of the objection seems to be that counsel was making a statement of law which was erroneous and different from the court's charge.

We do not so interpret the argument in the light of the context in which it was made. The part of the argument immediately connected with that part about courtesy is:

"'And from the other end of the line working on the extra board for this bus company, coming on up through the weather as bad as it was, and he came over the hill, the highway was ahead of him, and his impulse was to get going and get on to Madisonville. He was going down hill, alone in the bus, and he accelerated the bus as he saw these other cars coming, and urged it on with a determination to beat them across the bridge. It was a narrow bottleneck of a bridge, the highway was wet and slippery and his whole purpose was to get across the bridge before the others got there. If a more experienced man than he had been driving the bus, he might have had a *little more prudence,*

*or perhaps,* a little more courtesy, for courtesy, is after all, a standard of care (interrupted)'"

We think the argument within permissive range of counsel's discussion of appellant's agent's conduct.

The judgment of the trial court is affirmed.