### W. C. ADAMS, Appellant,

v.

### HOUSTON BELT & TERMINAL RAILWAY COMPANY, Appellee.

#### No. 14807.

Court of Civil Appeals of Texas.

Houston.

July 7, 1966.

Rehearing Denied Sept. 8, 1966.

Thompson & Hippard, James J. Hippard, Houston, for appellant.

Fulbright, Crooker, Freeman, Bates & Jaworski, Charles M. Haden, Gary B. Webb, Houston, for appellee.

WERLEIN, Justice.

This suit was brought by appellant under the Federal Employers' Liability Act to recover damages for personal injuries sustained by him in a collision during switching operations on July 5, 1964. The case was tried by the court without a jury, and the court found that the defendant, Houston Belt & Terminal Railway Company, was liable to appellant in the sum of $1500.00 damages.

Appellant first complains that the trial court failed to make findings of fact as to whether appellant sustained a neck injury in the collision, and also whether a prior neck injury sustained by appellant in 1961 was aggravated by the collision which occurred on March 5, 1964. The court, on request of appellant to make findings of fact and conclusions of law, incorporated in its judgment both findings of fact and conclusions, but did not make any finding with respect to requests for findings that appellant did not sustain a neck injury and that appellant's neck injury received in 1961 was not aggravated by the trauma sustained on the occasion in question. The judgment of the court containing findings of fact and conclusions of law was entered on September 27, 1965. Appellant did not request additional findings of fact or conclusions until October 6, 1965, which was more than five days from the date of the court's original findings of fact and conclusions of law contained in the court's judgment.

It is our view that appellant's request for additional findings of fact was filed too late under Rule 298, Texas Rules of Civil Procedure. Furthermore, such request for additional findings did not call for findings of ultimate fact but instead called for findings of purely evidential matters. For such reason there was no error on the part of the court in failing to make such additional findings. The omission of such findings has not and will not in any way prevent appellant from making a proper presentation of his case in this Court since the statement of facts includes all of the evidence adduced at the trial.

Appellant complains that the trial court's finding of only $1500.00 damages is so inadequate and so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. This assignment requires a careful consideration and review of all the evidence adduced at the trial.

The evidence shows that appellant, a switchman in the employ of appellee, sustained an injury when a rough or hard coupling was made in switching operations by appellee's engineer, Mr. Goley. Appellant, at the time of such coupling, was standing in the cab of the engine and was thrown against the generator housing of the engine or other hard substance, the left side of his chest and left arm striking the same with considerable force, throwing him to his knees, and causing some swelling and a knot on his left forearm and pain in his left chest. No bones were broken, and, according to appellant, his left arm and chest were completely healed and stopped hurting him probably within seven weeks after the accident.

Appellant's main contention is that he suffered a neck injury on the occasion in question and also an aggravation of a preexisting neck condition. The evidence shows that in March, 1961 appellant, while riding on the side of one of appellee's railroad cars, sustained a severe injury of his cervical spine when he was struck on the head by a door of a car on a parallel track, and that as a result of such injury he was paid $16,000.00 by appellee in settlement of his suit for damages. Appellant testified that as a result of the 1961 injury he lost fourteen months from work. He then passed a physical examination given by

appellee's doctor, Dr. Moody, and returned to work. He completely recovered from such injury and resumed normal activities including the playing of golf.

With respect to the accident of July 5, 1964, appellant testified that after the accident and after they went down the main line of the railroad track to a siding, his neck pain started; he drove his own car home, and then his wife drove him to the hospital where he saw Dr. Moody, who examined him and gave him a pill and told him to go home and rest and to come to his office the next morning; a day or two later he was admitted to the hospital where he remained until July 10; Dr. Moody saw him three times and Dr. Brodsky examined him one time; Dr. Moody ordered cervical traction; some two weeks after he left the hospital he saw Dr. McGehee, who had been his doctor at the time of the 1961 injury; Dr. McGehee placed him in a Thomas collar and gave him neck therapy; he saw Dr. McGehee about ten times and he was given some thirty therapy treatments at the doctor's office; he had not been able to work but had done so; that Dr. McGehee had "stipulated" that he could not return to railroad work.

Appellant further testified that after such injury he first worked as a member of the Sheriff's Auxiliary; that he had worked as a private store detective and as a railroad detective, and had represented on an application to work for the Port Terminal Railroad Association dated January 30, 1965 that he had no physical defects visible or invisible; that he had worked a month and a half for Texas Gulf Tank Company, doing lay-out and fitting work, but that the work was too heavy for him and he quit although no one asked him to do so; that he had worked for Belmas Corporation doing the same kind of work; that to obtain his job with Texas Gulf Tank Company he had to take a physical examination; that such work required physical activity; and that at the time of the trial he was working for Robertson Manufacturing Co. doing lay-out work and had been so work-ing for some two months, missing a few days; and that he was paid $2.85 an hour, whereas during the year 1963 when working for appellee his gross earnings were approximately $5,600.00. Appellant also testified that his neck pained him all the time, some times worse than other times, and that he could not play golf because swinging golf clubs hurt him.

Dr. McGehee, whose qualifications were admitted, testified in substance that after appellant's injury in March, 1961, he had recovered and had returned to work in May, 1962; that appellant came to him in March, 1963 complaining of pain in his neck but the complaint was wholly subjective; that he did not see appellant from March, 1963 to July 14, 1964, when he diagnosed appellant's condition after the 1964 injury as "traumatic injury to the left chest, cervical spine and left forearm"; that he prescribed a Thomas collar for neck support and recommended a muscle relaxer and pain medication; that when he first saw appellant he had a 75% restriction of motion in his neck which was reduced to 50% by August 28, 1964, and reduced to 25% to 30% some thirteen months after the 1964 injury. He further testified that on August 28, 1964, he recommended that appellant gradually discontinue using the Thomas collar and that he return to light work; that he saw appellant again on September 23, and appellant still had pain in the cervical back, particularly on moving his head from side to side, and that he recommended continuation of therapy; that he re-examined appellant's cervical spine in January of 1965, and found that he had flattening of the Lordotic Curve which was not extremely severe; that when he x-rayed Mr. Adams in July of 1964 he did not think he had any abnormal contour on that occasion, and that usually a flattening of the Lordotic Curve was due to muscle spasm and tightening of the ligaments and muscles, and that one purpose of his treatment was to try to get the normal contour back.

He further testified that he recommended that appellant continue heat and traction;

that he found no spreading of the joint spaces of the cervical spine and no evidence of instability when he examined appellant in January, 1965; that in March, 1965, appellant was complaining of numbness in his left arm and hand and ring finger; that the last time he saw appellant was August 22, 1965 (about three weeks before the trial commenced), and that three joints in the neck showed some degree of narrowing and that there were still present pain factors; that despite all efforts at conservative treatments, appellant had shown very little, if any, response; that he thought appellant's condition was permanent unless there was surgical intervention, and that appellant had not been able to do railroad work down to the time of the trial; that no myelogram had been taken, and that he would not recommend an operation if a myelogram was negative, but would recommend exploration of the neck; that even if there was a successful operation appellant would still have a 10% to 20% disability; that he doubted if appellant could return to the type of work he had been doing, involving bending, etc., and that he recommended that he not do so.

Dr. McGehee testified that his bill was $592.50 for services rendered the appellant during a period of fourteen months following his injury of July 5, 1964. He further testified that most of his diagnosis and prognosis were based on subjective complaints, and that he would expect to find muscle spasm right after the injury and not months later, but that he did not find any right after the injury; that his testimony with respect to numbness was based upon what appellant told him and that there was only one objective symptom and that was the flattening of the Lordotic Curve which was shown in one set of x-rays taken in January, 1965, some six months after the injury, and which appellant did not have right after the accident; and that in reasonable medical probability the accident of July 5, 1964 was the producing cause of traumatic injury to appellant's cervical spine.

Dr. Brodsky, an orthopedic surgeon who was requested by Dr. Moody to examine appellant, testified that appellant was admitted to the hospital on July 7, 1964 and that he saw him on July 9; that appellant complained of pain in his left chest, midline, neck extending to the left side of his neck, and pain in his left forearm where a hematoma was obvious; that appellant denied having any numbness or tingling sensation; that he found no evidence of fracture or dislocation in any of such locations; that upon appellant's subjective complaints and subjective responses to testing, he diagnosed his neck condition as a cervical spine sprain; that he found old degenerative changes in the third cervical disc space which were shown in the x-ray that was taken; that x-rays were made on July 5, 1964 and additional x-rays of appellant's cervical spine were made on July 7, 1964; that his prognosis was good and that he thought appellant would respond to conservative measures without any permanent disability; that he saw no indication for surgery; that flattening of the Lordotic Curve where it occurs is due to muscle spasm and can be due to pain irrespective of the cause, and sometimes due to nonpainful causes; that he accepted appellant's history as a subjective thing that he had a cervical spine sprain, but he saw no objective, clinical signs of such diagnosis in the strict sense of the word, and there were no truly objective findings.

Dr. Moody, the general surgeon for appellee, saw appellant about 2:30 p. m. on July 5, 1964 in the emergency room of St. Joseph Hospital. Appellant had a slight swelling in the medial surface of the middle third of his left forearm, and complained of pain in his chest, and discomfort in his neck, chest and forearm; that the x-ray taken showed no fractured ribs; that his diagnosis was, after examining him, a possibility of fractured ribs, a possibility of a cervical sprain, and contusion and possible hematoma of the forearm; that there were no objective findings other than the swelling of the forearm; that his diagnosis of possible cervical sprain was based upon the patient's complaint of discomfort; that they treated

him symptomatically that day, and the next day the patient stated that he hurt more than he had previously, and he wanted to go in the hospital; that they hospitalized him for further observation; that his diagnosis remained the same and treatment was symptomatic; and that the patient was fitted with a chest support, for—assuming that he might have—a cracked rib that they couldn't demonstrate, and this would help to make him more comfortable.

He further testified that appellant had been posted for surgery by Dr. Brodsky for a spur on his foot, and that since he was being seen by Dr. Brodsky, he asked Dr. Brodsky to see him in consultation; and that appellant left the hospital on July 10; that his prognosis was that there would be probably two or three weeks of soreness, and eventually complete recovery under treatment in three to six weeks; that he saw nothing at that time to indicate that appellant was a candidate for neck surgery, and that he personally examined appellant's neck and found that he had good motion, with no restriction; that they had x-rays of appellant's neck on two different occasions, and on one occasion they mentioned some early degenerative changes, confined mainly to the C-3 interspace, with what suggested posterior lipping, and on another occasion they mentioned a slight limitation of motion; that he, Dr. Moody, in the studies they made, and the observations that he made, could see no reason to ever think of neck surgery; that the only objective sign would have been the reported slight straightening shown on the x-ray, and that appellant had full function of the cervical spine, but complained of discomfort with motion, which was a subjective complaint, and that all the tests performed were normal although they did remark on a second x-ray that there was a suggested limitation of motion in flexion and in extension studies.

He also testified that the x-ray taken by Dr. McGehee in August of 1964 showing a normal contour of appellant's spine would indicate there was not enough muscle spasm to produce any change in the normal contour and would make them feel more confident that the patient did not have much injury; that muscle spasm is thought to be the reason for a straightening of the spine, and it is ordinarily associated with some sort of sprain of the neck but could be associated with a degenerative change in the spine; that if appellant had the injury of the character and magnitude described by appellee's attorney, he would have expected a great deal of muscle spasm and more objective signs of injury than he saw, and that appellant certainly showed no evidence of injury of that magnitude, and that in his opinion there was no serious injury present, and that he had no reason to think otherwise, and that he did not personally ever see any cervical straightening in appellant and that none was recorded; that he did prescribe traction for appellant and muscle relaxant medication, and that he expected appellant's cervical sprain to clear up in a matter of weeks in the normal course of things; that he would not expect straightening in the spine six or seven months later in relation to this injury, and that he couldn't conceive that an injury would cause a straightening six months later unless they had earlier evidence of it, and that when they have straightening they usually pick it up on the first x-ray, and not seven or eight months later, and while he wouldn't say it would be impossible, it would not be probable or logical.

We have read the statement of facts and carefully considered all of the evidence, both that supporting the trial court's finding of damages and that militating against it. The medical testimony is based largely upon complaints made by appellant and subjective symptoms. Although the evidence indicates that appellant did sustain injuries on July 5, 1964, including probably a sprain of his neck based upon the subjective findings of Dr. Moody and Dr. Brodsky, the court could reasonably have concluded that there were other conditions present which were causing appellant pain and some limitation of motion in his neck. The evidence clearly shows that there were at the

time he sustained such injury degenerative changes in the third cervical disc space, and further that such condition could cause pain, and a flattening of the Lordotic Curve. Although appellant pleaded that his condition resulting from the injury in 1961 had been aggravated, there was no evidence whatever to such effect.

■ This Court has the power to grant a new trial where the finding of the jury or the court is so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust, but we are not authorized to substitute our judgment for that of the jury or the court simply because we might have reached a different conclusion on the facts. Dyer v. Sterett, Tex.Civ.App., 248 S.W.2d 234; Continental Bus System, Inc. v. Biggers, Tex.Civ.App., 322 S.W.2d 1, writ ref., n.r. e.; Donnell v. Acker, Tex.Civ.App. 1961, 343 S.W.2d 718; Dallas Ry. & Terminal Co. v. Farnsworth, 1950, 148 Tex. 584, 227 S.W.2d 1017; 4 McDonald Texas Civil Practice, Section 18.15, p. 1459; Rule 328, Texas Rules of Civil Procedure.

In Evans v. Rush, Tex.Civ.App. 1952, 254 S.W.2d 799, the court said:

"This being a non-jury case the trial judge was the trier of facts under the rules previously herein stated and considerable latitude is vested in him in determining the amount of damages to be awarded in a personal injury action such as this. The damages in a case of this character cannot be measured by a mathematical yardstick."

In Nunn v. Daly, Tex.Civ.App., 150 S.W. 2d 834, writ dism., judgment cor., the court stated:

"The rules governing the authority of an appellate court to set aside a verdict because of inadequacy are the same as those applicable to an excessive verdict. 13 Tex.Jur. 265, § 150. In Lang Floral & Nursery Co. v. Sheridan, Tex.Civ.App., 245 S.W. 467, 471, it is said: '* * * The

amount of damages to be awarded in a case is as much within the province of the jury as the determination of any other issue of fact, and we are as much without authority to substitute our judgment for that of the jury in this respect as we are with reference to any other issue of fact, provided it does not reasonably appear to be based upon, or influenced by, something besides substantial evidence.'"

■ In our opinion the trial court's finding is supported by substantial evidence, including medical testimony. We are unable to say that such finding is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

Judgment affirmed.