Mrs. Ella B. WILDER et vir, Appellants,

v.

Wyman B. GIBSON, Appellee.

No. 15457.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

April 24, 1969.

Harrison, Taylor & Werner, Brown, Kronzer, Abraham, Watkins & Steely, Houston, John Werner, W. James Kronzer, Houston, of counsel, for appellants.

Don Weitinger, David Leuders, Houston, for appellee.

BELL, Chief Justice.

This is an appeal from a take nothing judgment in a case where Mrs. Wilder, who was a passenger in a station wagon, was allegedly injured when the vehicle in which she was riding was hit from the rear by an automobile driven by appellee.

In a jury trial the jury found appellee failed to keep a proper lookout and this was a proximate cause of the collision. The jury, however, found in answer to Special Issue No. 5 that William R. Wilder, the son of Mrs. Wilder who was driving the Wilder vehicle, "failed to give such a signal of his intention to stop as would have been given by a person of ordinary prudence in the exercise of ordinary care." In answer to Special Issue No. 6, the jury found this omission to be a proximate cause. In answer to Special Issue No. 7, the jury found Mrs. Wilder did not sustain physical injury as a result of the collision.

Appellants, for reversal, assert that the jury's answers to Special Issues Nos. 5, 6 and 7 are contrary to the overwhelming weight and preponderance of the evidence.

The collision occurred on the Eastex Freeway on the morning of February 3, 1966, between 6:45 and 7:00 o'clock. The Freeway is heavily traveled. All testimony shows that the traffic on this morning was fairly heavy, as usual. The Freeway is a divided one, there being a concrete esplanade. The parties were traveling south toward Houston. There were three lanes for traffic leading into Houston. Wilder and Gibson were both in the left lane next to the esplanade. Wilder was driving his mother to the cafeteria where she worked and was then going to his work. Gibson was driving to his work. Gibson intended to turn off of the Eastex Freeway and on to Interstate 610. To do this would necessitate his crossing from the lane in which he was traveling to the outside or third lane. The traffic in the center and outside lanes was fairly heavy as usual. Immediately prior to the collision appellee looked briefly to his right to see if he could move to his right. He could not, and when he looked back saw that the traffic in the inside lane had stopped or was stopping. He put on the brakes, pulled to his left partially on the esplanade, but was unable to avoid the collision. The right front part of his vehicle hit the right rear of the Wilder car and knocked it into the vehicle that had stopped in front of the Wilders. The Wilder vehicle received substantial damage and could not be moved except by being towed away by a wrecker.

The argument of appellee is that William Wilder was slowing down or stopping his car and gave no signal evidencing his intention to do so, though he could have done so. He contends the evidence sufficiently shows that Wilder had time to give a hand signal, and that he could have but did not. If he had done so, Gibson urges he (Gibson) would have seen it in time to have stopped. Appellee cites Article 6701d, Section 68(c), Vernon's Ann.Tex.St., as placing on Wilder the duty to give an appropriate signal so a driver to the rear can

learn of the intention of the driver of the forward vehicle.

■■ Appellants' position is that when an overtaken vehicle is making a required stop while it remains in its lane of traffic, the driver is under no duty to keep a look-out to the rear. Appellants, under the facts of this case, find no duty on the part of Wilder to give a hand signal because he was making such a required stop. Too, they urge that even if there was a duty, the failure to do so, under the facts of this case, was not a cause in fact of the collision because the Wilder brake lights gave notice to appellee and appellee had previously noticed the traffic slowing. Appellants' approach is not that the answers to Special Issues Nos. 5, 6 and 7 are wholly without evidence to support them, but rather that the answers are contrary to the overwhelming weight and preponderance of the evidence. In determining this question, we must consider all of the evidence, both that which supports the answers and that which militates against them. We may not merely substitute our judgment for that of the jury. We may reverse only if we conclude on a basis of the whole record that the answers are so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and thus shocking to the judicial conscience. Continental Bus System v. Biggers, 322 S.W.2d 1 (Tex.Civ.App.), ref., n.r.e.

William R. Wilder testified by deposition as he was in the United States Navy and could not be present at trial. He was 19 years of age. He stated that on the morning of the collision the traffic was fairly heavy. There was a truck in front of his vehicle. About a block or so before the point of the collision he was driving about 50 miles per hour. He was not expecting the traffic in his lane to stop. He could not tell what was making the traffic come to a stop. He slowed down from 50 miles per hour directly to the stop he made. He did not give a hand signal because it was cold and the car windows were up. So far as he knew the rear signal lights were working properly. Farther back down the road he had looked back and there was no traffic. The traffic "did come to a stop and" he "would close down and stop." He then heard the brakes behind him and then looked in the mirror and then his vehicle was hit. All he could tell was he "stopped from 50 miles per hour to a stop" and his car was hit. The brake lights on the vehicle ahead of him came on. He stopped four or five feet behind this car. He was knocked into the car ahead of him. If his window had been down it would have been better to give a hand signal. His stop was gradual and not sudden. There was plenty of time to stop. He had a good hundred yards in which to stop. He had been on the Freeway approximately three miles. He stayed behind the car in front of him about four car lengths. Everyone was driving about 50 miles per hour and was keeping roughly a three or four-car length interval. It was unusual that traffic would stop that far out. The stopping of the traffic was something he wasn't looking for. Gibson, as he remembers, said he was changing lanes and the traffic stopped and he pulled over into the witness' lane. Gibson also said it was Gibson's fault and he was sorry. Gibson's car, after the accident, was partially on the esplanade.

Mrs. Wilder testified the weather was cold and the windows on the car were up. It wasn't raining. It was daylight. Her son was driving around 45 or 50 miles per hour. She and her son were coming up to some traffic. She saw the traffic ahead was beginning to slow. She could see it slowing and coming to a stop. They could see a good little distance ahead that traffic was slowing and people began putting on their brakes. They could see the brake lights. Her son gradually slowed and stopped as the other cars were coming to a stop. There was no hill on the Freeway. A person could see pretty good. The Wilder car was stationary waiting for the traffic to start when it was hit. The traf-

fic in the other two lanes was moving. The impact knocked her under the seat.

Appellants took appellee's deposition, a part of which was used on trial, and appellee personally testified at the trial. In the deposition he testified that on the day of the collision the weather was normal. He didn't think it was cold. The streets were dry. The traffic was fairly heavy. He was driving in the inside lane. He got on the Freeway a mile and a half or two miles north of the point of the collision. He followed behind the Wilder car for a distance of several hundred yards. He was driving a 1954 Chevrolet pick-up. The traffic was moving at a normal pace. He had been anticipating moving over to the outside lane so he could turn right on Interstate 610. He looked to the right and looked right back, and he saw the cars stopped. He hit his brakes and pulled to the left in an effort to get on the esplanade so he would miss the Wilder car. He had looked to his right anticipating a move to the center lane, and then to the right lane. On looking back he saw the Wilder car, but didn't see anything but it and it had stopped. Prior to turning his attention to the right he was quite a way behind the Wilder car. He was at least four or five car lengths behind. The traffic in the inside lane was moving at 30 or 35 miles per hour. *It was slowing down. He saw it slowing down. He could tell it was slowing down.* He did not know why it was slowing down. When he looked back he saw the Wilder vehicle stopped. There wasn't enough room on the esplanade for the full width of his pick-up. When he hit the Wilder car he was going 15 or 20 miles per hour. The Wilder vehicle was knocked into the vehicle in front of it. He thought his window was down. He did not know whether the taillights on the Wilder car were working. All he saw was that the car was stopped. Nobody gave any signal they were going to stop. All of a sudden they stopped. By the term "signal" he meant hand signal. *He did not recall whether the taillight came on. They could have come on. It happened so quick he just couldn't say.* He did not know whether Wilder had enough time to roll down the window and give a signal.

At the trial as a witness Gibson testified that the deposition testimony read was essentially correct. When he looked to his right he just glanced and then glanced right back. When he glanced back the *traffic* in front of him had stopped. *He did not recall saying it was his fault.* From the point of the collision to where he was to turn off was approximately a mile. He wasn't expecting traffic to stop out there. *Normally he thinks everyone driving on the Freeway out there has in mind traffic might stop. He had that in mind.* He had seen it stop on a few occasions. *Before the collision he had seen the traffic slowing down. It looked to him like it was slowing down a little bit.* He then glanced to the right. He knew if the traffic kept moving at the same rate of speed, he was far enough away. *If the traffic in front of him hadn't slowed down or stopped he would have been safe in looking back.*

■ We will assume, without deciding, that under the particular facts of this case appellant had a duty to give a hand signal. We are, however, of the view that the jury's answer to Special Issue No. 6, finding the failure to give a proper signal to be a proximate cause of the collision, is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong.

Appellee had seen the traffic in his lane slowing down. He was three or four car lengths behind appellants. While he was looking back the traffic stopped. If appellee had been looking, the appellants' brake lights probably would have given him notice of the impending stop. He didn't see them because he was looking to his right. He wouldn't have seen a hand signal either. An earlier hand signal would have added nothing because appellee had already noticed traffic slowing down. See Dobson v. Gulf Supply Co., 399 S.W.2d 882 (Tex. Civ.App.), ref., n.r.e.; McNutt v. Qualls,

433 S.W.2d 521 (Tex.Civ.App.,) n.w.h.; Ussery v. Ewell Hodges, 417 S.W.2d 332 (Tex.Civ.App.), ref., n.r.e.; Morris v. Long, 410 S.W.2d 308 (Tex.Civ.App.), n. w.h.

■ We now determine whether the jury's finding that Mrs. Wilder suffered no physical injury is contrary to the overwhelming weight and preponderance of the evidence.

We have heretofore stated facts showing that the impact was sufficient to do substantial damage to appellants' vehicle. The pictures show substantial damage to both the rear and front of their vehicle.

Mrs. Wilder was sitting in the front seat. She testified the force of the collision knocked her under the seat. (She obviously meant onto the floor and under the dashboard.) She said she was not able to get out of the car under her own steam. She lay there "a few minutes" and then slid back up onto the seat. Her son said: "Mother, you're hurt." She said she didn't feel hurt. Then the officers came and helped her out of the car and put her in another one where she stayed until her husband came about 20 or 30 minutes later. When asked how she felt at the time Mr. Wilder arrived, she stated: "Well, I wasn't hurt. I wasn't hurting nowhere, but after he come and picked me up I begin to hurt. I was hurting so bad in my back that he took me by my work and told them * * * I had been in an accident and I was going to the hospital." Mr. Wilder took her to Dr. Brown's at the Little York Hospital. Dr. Brown took x-rays of her back. She was hurting so bad in her back that the doctor gave her a shot in her back. He also gave her a prescription for pain and told her to go home and lie on a heat pad. She did as the doctor said. She filled the prescription. She continued to hurt except when she would take a pill. This and use of the heating pad would give her relief. She missed work on the day of the accident, which was a Thursday. She worked on Friday. She had Saturday and Sunday off. On these two days she stayed at home and kept the heat pad on her back and leg. On these days her neck was hurting her. She had "an awful knot" that came on her neck. She worked the next week. The doctor told her to try to work the soreness out. When she went back to work she stopped doing heavy work and was given light work. She had worked at the cafeteria about seven years at that time and at the time of trial had worked there nine years. She still worked there at the time of trial. From the time of the collision to the time of trial she had received two raises aggregating $20.00 per week. She worked until November, 1966, when she was placed in the hospital by Dr. Veggeberg. She then missed four weeks of work. While she continued to work, she tired and it was hard on her. She had, previous to the collision, seen a doctor. She was taking something for high blood pressure. She had not previously been in the hospital. She had never been treated for a serious illness or for any injury. Since the accident she had been to see Dr. Brown about six times. The last time was in July, 1966. About a week after the accident she was hurting and he gave her an injection and told her to go on and do her work "and work this out." He never gave her an injection in the neck. The injections would help her for several hours. She didn't seem to get better. Her neck hurt and her arm would go to sleep. She told Dr. Brown about this. He prescribed no additional treatment. She and Mr. Wilder didn't think Dr. Brown was doing her any good. Her husband told her to go to some other doctor. She knew no other doctor, so she called her lawyer who told her to go to Dr. Veggeberg.

In November, 1966 Dr. Veggeberg put her in the hospital. He put her in traction and gave her a special pillow. She still uses the pillow every night. She was in the hospital nine days. They also gave her heat treatments in the hospital for her neck and back. After she left the hospital, she stayed at home about three weeks.

While at home she used a heat paid and would go to the hospital twice a week. She still has pain. A girdle with steel staves was prescribed and she had to wear it about a year. Her chest started hurting. This came after the wreck. While she was in the hospital two other doctors were called in by Dr. Veggeberg. She was given a collar to wear on her neck. She wears it at home. Prior to the wreck she did all her house work. She cannot do so now. They had a milk cow which she milked. She can do this no longer and they had to get rid of the cow. They had a camp they formerly went to on the weekends. She is seldom able to go now.

Dr. Brown was the only doctor they knew. She had faith in him.

Mrs. Wilder was 52 years of age. She had never previously been hospitalized except for an appendectomy. In stature she was a heavy woman. She had never had any health problem prior to the accident. She was taking some pills for high blood pressure.

Mr. Wilder, the husband, who worked for the University of Houston, was a carpenter. He and Mrs. Wilder had been married 33 years. They had four children. A couple of hours afetr the accident she began getting sore and stiff. She complained of her lower back and neck. Prior to the wreck she was a good worker. She was never a complainer. Since the wreck she has complained of pain over the past two years. During their marriage she had been in the hospital a couple of times for swelling of her feet. This was in '36 or '37. Mr. Wilder corroborated Mrs. Wilder in her testimony concerning her curtailed activities since the collision.

Mr. Smith, Mrs. Wilder's employer, had known her for 15 or 20 years. He thought she had been working for him 11 or 12 years. She is a good employee. So far as he knew she was in good health prior to the injury. She had previously never complained about not being able to do her work out there. He noticed a change in her. For a while "she couldn't lift anything to amount to anything. She did light duty. She is still a good employee and has gotten some raises since the accident. Without regard to whether she could lift and bend and stoop a lot, he wanted to keep her out there.

The investigating officer testified Mrs. Wilder was shaken up. At that time she didn't complain of injury.

Mr. Gibson testified that after the collision he went over to the Wilder car. The Wilder boy was out of the car. He asked the boy and Mrs. Wilder if they were hurt. Each answered "no". Mrs. Wilder was at that time sitting in the front seat where she remained until the officers arrived.

Dr. Veggeberg first saw Mrs. Wilder in November, 1966. He is an orthopedic specialist. He testified to facts as to the treatment he prescribed. It is substantially as shown above in Mrs. Wilder's testimony. He was concerned about whether she had a herniated intervertebral disc at the lumbosacral junction. He thus caused Dr. Barsela to run a neurological examination. They ruled out the possibility of a "disc". On his initial examination she complained of her neck, back, and that her right hand would go to sleep. She had positive findings with respect to range of motion in the cervical spine, there being a decreasing range of motion and in the neck. Their were spasms of the cervical paravertebra muscles, which are the muscles alongside the bones in the neck. There was in the low back flattening of the lumbar lordotic curve. There was pain on strain applied to the lumbosacral spine. Based on Mrs. Wilder's history and what Dr. Veggeberg found, he concluded she received a strain of her neck and low back in the accident. There was about 10% loss of motion in her back.

On cross-examination appellee developed that the witness had seen 30 or 40 patients for the firm of lawyers representing Mrs. Wilder and that his fee for examination and testimony was being guaranteed by her

counsel. Also the witness' original notes did not contain reference to her muscle spasm or anything about cervical injury. She had varicose veins. An E.K.G. showed possibility of a left ventricular hypertrophy. The record showed "S1 Enlarged." This meant slightly enlarged. His nurse wrote "slightly enlarged." There was also the notation of high blood pressure.

Dr. Brown was not used as a witness. His bill is in evidence. It reflects injection of Bendryl on the day of the accident. It also reflects a "procaine injection to tender spot" on March 12, 1966. Other office visits on February 14, May 25 and July 2 and 25 are reflected.

We are not here concerned with the extent of injury, but with the question of whether there was in fact some injury. More specifically, we are concerned with whether the jury's answer that Mrs. Wilder suffered no physical injury is contrary to the overwhelming weight and preponderance of the evidence.

A consideration of all the testimony leads us to the conclusion that the jury's finding of no physical injury is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong.

Reversed and remanded.