Mrs. Grace A. BICKHAM, a Feme Sole,
Appellant,

v.

HERRIN TRANSPORTATION COMPANY,
Inc., et al., Appellees.

No. 13629.

Court of Civil Appeals of Texas.

Houston.

March 23, 1961.

Tynes, Turk & Miller; Davis, Phelps, McDermott, Norton & Liles, Raymond L. McDermott, Houston, for appellant.

Quinnan H. Hodges, William E. Wright, Houston; Butler, Binion, Rice & Cook, Houston, of counsel, for appellees.

WERLEIN, Justice.

Mrs. Grace A. Bickham brought this suit to recover damages for personal injuries sustained by her as a result of a truck owned by appellee, Herrin Transportation Company, Inc., and driven by appellee, Jack Leaser, running into the rear of her automobile which had stopped at a red light at the intersection of Lawndale and Telephone Road in the City of Houston. From the court's judgment based upon the jury's verdict finding no negligence and that the accident was unavoidable and caused solely by an emergency, appellant appeals.

Appellant complains that the evidence is insufficient to support the jury findings of no liability, and also that plaintiff was deprived of her constitutional and statutory right to have the case determined by a trial judge who heard all the evidence touching the liability of appellees.

The jury in answer to special issues found that the truck was not being driven more closely behind appellant's automobile than would have been driven by a person of ordinary care; that the truck driver, between the time he saw the light was red and the collision, did not fail to make a proper application of his brakes; that the failure of the truck driver to turn his truck either to the right or left immediately before the collision was not negligence; that the truck driver was not operating the truck at a negligent rate of speed; that the truck driver did not fail to have the truck under proper control; that the truck driver did not fail to keep a proper lookout; that immediately before the collision in question the truck driver was acting under an emergency; that after such emergency the truck driver acted in the manner of an ordinarily prudent person in the exercise of ordinary care; that the emergency was the sole proximate cause of the collision, and that the collision was the result of an unavoidable accident.

We think the findings of the jury that the truck driver was not driving closer behind appellant's automobile than an ordinarily prudent person would have done; that the truck driver did not fail to make proper application of his brakes; that he was not operating the truck at a negligent rate of speed; that he did not fail to keep a proper lookout ahead, are supported by a great preponderance of the evidence. The finding of emergency and related findings have given us more difficulty. The evidence pertaining thereto will be discussed and analyzed to determine whether it is sufficient to support the jury findings.

The truck driver, Leaser, testified that he noticed appellant's automobile standing at a red light at a distance of 150 to 175 feet ahead of him. Appellant's witness, Wilson, testified he noticed appellant's car waiting for the red light and when he first saw the truck it was 60 to 65 feet behind such car which had stopped. There is ample evidence that the truck was not following too closely behind appellant's automobile and that the facts in this case are quite different from the ordinary case in which there is a rear end collision due to one car following too closely behind another. Leaser testified that when he was 150 to 170 feet from appellant's automobile, traveling about 15 or 20 miles an hour, he took his foot off the accelerator and allowed the drag of the motor to slow down the truck until he got within 50 or 75 feet behind appellant's car when he applied his brake. The brake

pedal immediately went "plumb to the floor boards." He thereupon grabbed the emergency brake and set it, but it did not hold the truck. The truck had slowed down to 5 or 6 miles an hour when it struck appellant's car. This testimony was corroborated by appellees' witness, Wesley Baker, who testified the truck was not going over 5 miles per hour when he first saw it at a distance of 25 feet behind the stopped automobile.

Leaser also testified that the accident happened because he could not stop due to failure of his brakes and that such failure was the first notice he had of any trouble with the brakes at all; that his brakes were not weak before then and had not given him any trouble all day; and that in the excitement he couldn't be positive that he got the truck geared down but it was in low after the accident.

It is appellant's contention that Leaser knew for some time before the collision that his brakes were not working properly and that the brake pedal was low, and for such reason there was no sudden emergency. Appellant contends that Leaser admitted that he had been pumping his brakes for some time prior to the collision. We cannot agree with the construction placed by appellant upon Leaser's testimony with respect to pumping the brakes. Leaser testified that when he hit the brake pedal he did so in a normal manner because he did not know the brakes weren't going to function; that he didn't have the slightest reason to believe that he would have no brakes; and that when the brake pedal went down to the floor he tried to pump it. He was then asked whether he had been pumping the brakes during the day and he testified: "Just for the application of the brakes, sir; no pumping to pick up power," and further that he had been using the brakes, but not pumping them to get them to hold. The following then occurred:

"Q. Had you been pumping them? A. Well, I don't know what you mean.

"Q. Well, that's a pretty common expression. You know, up and down like that? A. Well, possibly I did.

"Q. Well, how long had you been driving the truck? A. Three or four hours.

"Q. And isn't it a fact that sometime during those three or four hours you had been pumping those brakes with your foot? A. No, sir.

"Q. You say that's not a fact? A. No, I used the brakes to stop; just application to stop.

"Q. Well, a moment ago you said you possibly had, and I wanted to know now whether it's a fact. A. Well, to apply the brakes, Mr. McDermott, was the only time I had my foot on the brakes.

"Q. Well, what I'm asking you: Isn't it a fact, sir—and I think it is a clear question—that during that three or four hours you had pumped those brakes? A. Well, for application of the brakes, Mr. McDermott; to stop the truck, you know.

"Q. You had done that? A. I had not pumped the brakes, no, sir.

"Q. Well, had you given it this? (indicating an up and down fashion with the hand) You know, up and down? A. (No reply).

"Q. Whether you call it pumping or not? A. No, sir, not to cause the truck to stop. No, sir.

"Q. Sir? A. I say, not to cause the truck to stop, no.

"Q. Well, had you done it at all, whether you had done it to cause the truck to stop or not? A. I couldn't recall whether I done that at all; possibly put my foot on the brakes and then release it, yes, sir. But not to get power, Mr. McDermott."

It seems clear that what the witness was trying to say was that at times in the application of the brakes he would push down on the pedal and then release it and then push down again instead of exerting a continuous pressure on the brakes. We think it a matter of common knowledge that this is frequently done, not for the purpose of pumping up the brake to get power but as a method of brake application in slowing down or stopping a car or truck. In any event, the jury was warranted in so believing. It is true that appellant testified that Leaser told her shortly after the collision that he had been having trouble with his brakes and was trying to get the truck in to the Company. Leaser categorically denied making such statement but did testify that he may have told her that brake failure was the cause of the accident.

Officer Tyler, who was not one of the two officers assigned to investigate the accident, but who was present and assisted in the investigation, testified that Leaser told him at first that his brakes had failed and afterwards that they were "kind of low." Leaser denied stating that his brakes were low but did admit that he may have told the officer that the accident was due to failure of his brakes. Tyler also testified that about 15 or 20 minutes after the accident he got in the truck and by pumping the brakes was able to raise the pedal from the floor of the truck to about 2 inches above it. At that time the truck was stationary. Leaser testified that he pumped the pedal but without any result after the pedal went to the floor of the truck.

There is conflicting testimony as to whether a leak of brake fluid from a wheel cylinder would cause a sudden brake failure or a gradual brake failure which would put one upon notice. Tyler testified that he examined the left rear wheel of the truck and found there was brake fluid on the wheel, some appearing dry and some appearing wet, and that there was a spot on the pavement about the size of a silver dollar. He testified that the driver of the truck would have had notice and that he would be able to pump up the brakes. However, Tyler said he had never worked on that kind of truck.

Marshall Harris, an automobile mechanic, who had formerly been employed by appellee, Herrin Transportation Company, testified that he went to the scene of the collision and checked the truck's pedal to see if there was any pressure and there was none; that he found the left rear wheel cylinder leaking and noticed a black spot on the inside of the dual tire that appeared to be brake fluid; that some brake failures are gradual and some are not; that if a wheel cylinder goes out, the brake pedal gives away at once; that if he had been able to pump it up and raise the pedal he would have said it was a gradual leak. He had been unable to pump it up. He also said that a pool of fluid would indicate a sudden failure.

Mr. Gamble, Service Manager of Pruitt Brake Service, testified that if there was dried brake fluid on the wheel near the left wheel cylinder it indicated that the leak of fluid had stopped; that a pool of brake fluid would indicate that there had been a quick leak and failure of brake pressure; that if a cylinder breaks and there is a quick leak out, there will be a brake failure and you will have no brakes, and the brake pedal will go to the floor board.

There was other testimony from mechanics with respect to the effect of the leaking of brake fluid and as to whether the failure would be slow or sudden. We think there was evidence from which the jury could have found that Leaser had prior notice of the possibility his brakes might fail. On the other hand, there is evidence which would warrant the jury in believing that Leaser had no prior warning and that immediately before the collision he was acting under an emergency and that such emergency was the sole proximate cause of the collision.

The same is true with respect to whether Leaser had the truck under control and whether he was negligent in failing to turn to the right or to the left. There is some testimony that the left lane had a car in it at one time, although the weight of testimony seems to be that there was no car in the lane just left of the lane in which appellant's car and the truck were situated. Leaser testified, however, that he looked to the left lane and saw nothing but lights and couldn't find any way to go to the left. The accident was about 8 o'clock at night and it was dark. The intersection was a busy one and it could have been very dangerous to other motorists had he taken the left lane and run into the intersection. He tried to stop the truck in every way possible by pumping the foot brake and using the emergency brake. The jury probably also thought that he was not negligent in not turning to the right because there were one or more cars at the filling station with which he might have collided. Moreover, he was acting in an emergency. The jury evidently believed that in the few seconds he had between the failure of his brakes and the collision he was not negligent in doing more or other than he did.

We have read the statement of facts and have painstakingly reviewed the evidence, both that favorable to the jury's findings and that militating against the same, and have concluded that the findings of the jury are not so manifestly against the great weight and preponderance of the evidence as to be wrong and unjust. In re King's Estate, 1944, 150 Tex. 662, 244 S.W.2d 660; Dyer v. Sterett, Tex.Civ.App., 248 S.W.2d 234, ref., n. r. e.; Continental Bus System, Inc. v. Biggers, Tex.Civ.App., 322 S.W.2d 1, ref., n. r. e.; J. R. Shiflett v. Bennett Printing Co. et al., Tev.Civ.App., 330 S.W.2d 220.

Appellant forcefully contends that she was deprived of her statutory and constitutional right to have a trial court who heard all of the evidence touching on liability, pass upon the insufficiency of the evidence to support the jury verdict. As reflected by appellant's Bill of Exception No. 1, the evidence presented during the trial of the case was heard partly by Judge W. Sears McGee, who commenced the trial and heard appellant's and appellees' evidence in chief. Then, over the objection of appellant, Judge McGee vacated the bench and Judge Stovall heard the balance of the evidence consisting of one witness testifying in chief for appellees and five rebuttal witnesses put on by appellant. Judge Stovall continued to preside through the preparation of the charge and the argument of counsel to the jury. Thereafter, Judge McGee returned to the bench and accepted the verdict of the jury and handled all further proceedings in the case, including ruling on plaintiff's motion for new trial. Appellant asserts that she was deprived of her constitutional and statutory rights since her motion for new trial asserting the insufficiency of the evidence to support the jury's findings was overruled and denied by Judge McGee, notwithstanding the fact that he had not heard any of appellant's rebuttal evidence.

It should be said at this point that Judge McGee allowed and approved appellant's bill of exception with the following qualifications:

"Prior to going to trial in this case, Judge W. Sears McGee advised counsel that he would not be in Houston on Friday, November 6, 1959, because he would attend the meeting of the Board of Directors of the State Bar of Texas in Austin. Plaintiff's counsel made no withdrawal of his announcement of ready nor requested assignment to trial in another Court, which was available.

"Upon completion of the morning trial session on Thursday, November 5, 1959, Judge W. Sears McGee announced that Judge T. J. Stovall, Jr. would hear the case in his absence, at which time counsel for plaintiff made the objection stated above and requested Judge W. Sears McGee to re-

cess the case until the following Monday. This was refused. No motion for mistrial has ever been filed or urged.

"No objections or motions were presented to Judge T. J. Stovall, Jr. in connection with the foregoing."

There is nothing in the record to show that appellant requested Judge McGee to read the testimony of the witnesses whom he had not heard, or that he was presented with a transcript thereof, prior to ruling on appellant's motion for new trial, nor is there anything in the record showing whether or not Judge McGee did read such testimony. In the absence of such evidence, it will be presumed that he became sufficiently familiar with the testimony of witnesses whom he did not hear to determine the matter of granting or refusing to grant the motion for new trial.

Rule 330(g), Texas Rules of Civil Procedure provides:

"Where in such counties there are two or more district courts having civil jurisdiction, any judge may hear any part of any case or proceeding pending in any of said courts and determine the same, or may hear and determine any question in any case, and any other judge may complete the hearing and render judgment in the case."

Although the case of De Zavala v. Scanlan, 65 S.W.2d 489, is factually distinguishable from this case, it is significant that Judge Smedley of the Texas Commission of Appeals, at page 494, used this language: "By the terms of sections 24 and 25 [Article 2092, Vernon's Ann.Civ.St.] one judge may hear part of a case and another judge may complete the case and render judgment."

In Harkness v. McQueen, 207 S.W.2d 676, 679, this Court stated: "By force of Rule 330 the jurisdictions of said courts and the functions of the judges thereof have been integrated, and made interlocking as far as possible without obliterating the identity of the courts."

In the instant case the complaint is that Judge McGee heard the motion for new trial when another judge had heard a part of the evidence. Rule 330(h), T.R.C.P., provides in part:

"Where in such county there are two or more district courts having civil jurisdiction, any judge may hear and determine motions, petitions for injunction, applications for appointment of receivers, interventions, pleas of privilege, pleas in abatement, all dilatory pleas and special exceptions, *motions for a new trial* and all preliminary matters, * * *" (emphasis supplied).

In Edwards v. James, 1854, 13 Tex. 52, it was contended that it was not competent for Judge Devine, who was not presiding when the judgment was rendered, to act on the motion for new trial. Our Supreme Court held:

"It would be more regular, where one Judge sits for another, for him to act upon all matters or motions arising out of his proceedings, before he leaves the bench; but it is not indispensable that it should be so done, and is anything if left undone when he leaves the bench, and another Judge takes the seat before the expiration of the Term, the Judge last taking the bench can dispose of, and act on such matters, if he was competent to have tried the case out of which the motion arose."

In Randel v. State, 1949, 153 Tex.Cr.R. 282, 219 S.W.2d 689, 697, the court stated, on motion for rehearing, that broad discretionary powers have been conferred upon District Judges with respect to the exchange of benches and the holding of court for each other. The court said:

"No limitation as to time, place, or occasion when the exchanges of benches might occur has been fixed. So if district judges deem it expedient to exchange benches during the trial of a case, that power has been conferred

and their action in so doing becomes reviewable only to determine if an abuse of discretionary power has occurred. From what has been said, it is apparent that the common-law rule requiring that the same judge preside throughout the trial of a felony case has been expressly abrogated by the Constitution and statutes of this State."

■ In the Randel case the court further stated:

"We fail to see where an analogy can be successfully drawn between the changing of judges and the common-law rule demanding the presence of twelve jurors."

See also 88 C.J.S. Trial § 36, p. 95, where it is said:

"Except where it is prohibited by statute, a change of the presiding judge during a trial is not a fatal irregularity, unless actual prejudice results to a party by reason thereof."

In Hughes v. State, 1912, 67 Tex.Cr.R. 333, 149 S.W. 173, the court stated in substance that if necessity compelled the retirement of a judge for any purpose, he should suspend the proceeding until his return. The court concluded, however, that as no injury whatever was shown to the appellant by the judge absenting himself, reversal of the case would not be authorized on that account alone even in a felony case.

■ Appellant undertakes to distinguish the Randel case from the instant case on the ground that in the Randel case no objection was made to the exchange of judges, whereas in the instant case appellant objected. It will be noted, however, that although appellant had advance notice that Judge McGee would be absent Friday, she did not withdraw her announcement of ready or request that the case be assigned to another available court for trial. We need not determine whether appellant thereby waived her right later to object to the exchange because whether she did or did not waive the same, she has failed to show any abuse of discretion on the part of the court or any error under the foregoing authorities and applicable rules of Civil Procedure. She has also failed to show any harm as a result of Judge McGee passing upon the sufficiency of the evidence supporting the jury findings, since this Court is required to pass upon the same and has the same power as the trial judge to do so. Rule 434, T.R.C.P.

Judgment affirmed.