Charles Ray ERVING et al., Appellants,

v.

Joe REISTINO, Sr., dba Joe Reistino Farms, Appellees.

No. 4827.

Court of Civil Appeals of Texas.

Waco.

Dec. 4, 1969.

Rehearing Denied Jan. 8, 1970.

Woodruff, Hill, Kendall & Smith, Dallas, Palmos & Russ, Hearne, for appellants.

Haley, Fulbright, Winniford, Sessions & Bice, Waco, M. M. Ottea, Jr., Hearne, for appellees.

## OPINION

HALL, Justice.

Charles Ray Erving, appellant, was severely burned as the result of a fire that occurred while he was parking a butane tractor near a butane tank on appellee's farm. At the time in question, Charles Ray and his family lived on the farm and were employees of appellee. Charles Ray was 14 years of age, and worked part-time during summers, evenings after school, and weekends. He was in the course of this employment when he was burned. Joined by his parents, he brought this action against appellee for his personal injury damages.

Jury trial resulted in findings of several acts of negligence by appellee that proximately caused the fire. The jury also found, in answers to Special Issues Nos. 19 and 20, that Charles Ray failed to keep "that kind of lookout which would have been kept by an ordinarily prudent person" of his age, and that this was a proximate cause of the fire.

Appellants filed a motion to have the trial court disregard the jury's answers to Special Issues Nos. 19 and 20, and render judgment for them. Appellee filed motions for judgment on the verdict and for judgment non obstante veredicto. Appellants' motion was overruled, and judgment was rendered on the verdict that appellants "recover nothing."

Appellants contend that the evidence is not legally sufficient to support the jury findings on issues 19 and 20. In resolving this question, we must consider and may only view the evidence and its inferences most favorably in support of the jury's findings, and we must reject any evidence and inference which is favorable to appellants' contention.

The butane tank in question held 500 gallons, and was cylindrical in shape but with rounded ends. It was ten feet in length and ran East and West. It lay on the ground in an open, flat area of the yard and was chocked. Its diameter was 38 inches. A multivalve permitting entry and exit of the liquid gas, plus tank vapor release, was located in the middle and at the very top of the tank. An excess flow valve and a three-quarter inch cut-off valve were joined by

short extensions of pipe, called nipples, and one of the nipples then screwed into an opening provided in the multivalve. The nipples and valves extended straight out toward the South side of the tank, rather than along the top curvature of the tank with its length. A fifteen foot flexible hose for filling the butane tractors was attached to the extension of pipe and valves. When not in use, the hose was usually kept coiled around the multivalve.

The tractor in question was a "Farmall 560," the largest tractor on the farm. It operated on butane. It was about ten feet long, and the rear wheels, including tires, were about 63 inches in diameter. Charles Ray was a "good tractor driver" and had been driving this particular tractor about nine months.

On the occasion before us, Charles Ray agreed to help another employee, Charlie Anderson, feed the cattle. The time was late afternoon on a Sunday in early September, 1963. The weather was clear and mild.

After they had loaded a pickup truck with hay, the truck would not start. Charles Ray got the tractor, pulled the pickup, and it started. Anderson, driving the pickup, headed toward the pasture with the hay, and Charles Ray trailed with the tractor.

Before reaching the gap in the pasture fence, Anderson passed within a very short distance of the butane tank. At that time the tank looked normal to him and he saw nothing wrong. He was the farm mechanic, and in his opinion, the tractor and the tank were both in "good shape," and there was "nothing wrong with either." He didn't see "any fog around it or anything like that, * * * or any gas coming out or anything of that kind." He knew the odor of butane, and did not smell it "anywhere around." It was his intention, after passing into the pasture, to stop and wait for Charles Ray.

Charles Ray saw Anderson go through the fence gap and into the pasture. He then veered toward the area of the butane tank for the purpose of parking the tractor. The tractor was facing East as Charles Ray traveled toward the tank, approaching the tank on its South side. He did not smell any butane as he moved toward the tank. He does not know what happened. He said: "I was going to stop it and back it up and park it. * * * I made an attempt to back up, but it just blew up all at once. * * * It was so quick and so sudden to me, I don't know what happened." All he remembers is that there was an explosion. He does not know what it was that exploded, nor what caused the explosion. He was blown from the tractor by the explosion. The tractor had stopped at the time of the explosion, but the engine was still running. He was familar with the location of the tank, and with its use, and it was in plain view. He testified that no tractors would have been filled from it that day, being Sunday.

No person other than Charles Ray was present at or near the tank at the time of ignition, and there were no other witnesses. Charlie Anderson did not see it happen, though he "heard something" that stampeded the cattle. Johnny Blair, standing beside his automobile at his home a few hundred yards West of the tank, said, "Well, I heard some kind of a big rumbling and I happened to look up there and I seen all that blaze * * *."

Joe Reistino, Jr., supervisor of the farm and son of appellee, arrived at the scene of the fire within five minutes after the fire began. The tractor was "up against the tank on the South side," facing West, parallel to the tank. The rim of the right rear wheel of the tractor was against the tank. A flame, "blowing like a blow torch," was coming from the valve control area at the top and center of the tank. He reached for the cut-off valve, but it was gone. He testified that the pipe that came out of the tank was still there, but that "the pipe that came sideways * * * was broken and the rest of these valves and the hose were broken off." He said that he saw a tire

mark on the South side of the tank—not on the top, but "down on the side there. * * * I guess it went up two feet there * * * the same angle the tractor was running into." The fire burned about 45 minutes. When the fire was over, he made an inspection of the tank and saw where the pipe and valves were broken off. On cross-examination, he stated that based upon his observation of the broken pipe, the tractor location, and the tire mark on the tank, it was his conclusion that "the tractor got upon the tank and broke off the pipe * * * and that caused the explosion." He said that butane and butane equipment had been used on the farm since 1956, and this was the first fire.

Charlie Anderson testified that the "main line" of the tank ran to the side of the tank "off of the main valve," and that "the valve that is up close to the butane tank * * * got a check valve in it * * * so that if gas comes out too fast it will shut off entirely." He said that during the fire the tractor was headed West; that the motor of the tractor "was set up about center ways of the valves of the butane tank;" that fire was shooting from the tank to the South onto the tractor, and "splashed like water would splash" after striking the tractor; and that the butane tank was not burned "to speak of" during the fire.

Cooper Wiese owns the tank and services it with butane. He learned of the fire two days after it happened, and took the tank to his shop. He testified that the rear tire of a tractor had passed over the excess flow valve, which is made of heavy brass, and had broken it out of the multivalve "right here in the female threads of the multivalve." He said that the imprint of the tire was very clear on the aluminum paint of the tank; that the imprint started about halfway up on the tank, and that it then ran in a half-moon "right on over the curvature of the tank and right over the multivalve" and off down the same side of the tank on the other side of the multivalve. He said it didn't imprint at the point where it ran over the multivalve, but that it was just a half-moon on the same side of the tank "where the liquid line came out of the multivalve," running in a direction from one end of the tank to the other. He said the tractor tire "went between the multivalve and the valve is where it went."

Mr. Wiese testified that the excess flow valve had a safety feature built into it which would automatically cut off all flow of liquid if the filler hose beyond it were broken off or any excessive flow resulted beyond it from any cause. He said that gas flowing in the quantity that it was after the excess flow valve was broken off, if not ignited, vaporizes and "fans out" and looks like fog; that it would blow out 20 or 30 feet and drift like smoke; that it would be smelled because of the deodorant in it; that it would be coming out under 130 or 140 pounds of pressure, and could be heard from up to one hundred yards.

Mr. Wiese said that the tank is made of ⅜-inch steel; that it withstands a great deal of abuse; that it had no dents in it; that it had a little smoke on it but was not burned; and that he put a new multivalve in it and put it back in service.

Sylvester Erving, father of Charles Ray and a co-plaintiff, testified that he is a tractor driver for appellee; that he made use of the butane tank in question; that he knows of nothing that was wrong with the tractor or the tank.

Most of appellants' argument in support of their contention that the evidence is legally insufficient to support the finding on the "lookout" issue is based upon their erroneous assumption that the jury found that Charles Ray did not drive a tractor wheel against the valve on the butane tank.

▮▮ Special Issue No. 16 asked the jury whether it found from a preponderance of the evidence that Charles Ray "drove a wheel of the tractor in question against the valve of the butane tank, knocking said valve loose, at the time and place in question;" and was answered, "No." The negative answer to this issue simply means, in

law, that appellee failed to carry his burden of proving the fact inquired about to the satisfaction of the jury; and it is *not* a finding that Charles Ray did not commit the fact inquired about. C. & R. Transport, Inc. v. Campbell, (Tex.Sup.Ct., 1966) 406 S.W.2d 191, 194. Moreover, in determining "no evidence" and "preponderance of the evidence" questions, we may not consider nor give weight to the jury's findings on other issues. See C. & R. Transport, Inc. v. Campbell, supra; Enloe v. Barfield, (Tex.Sup.Ct., 1967) 422 S.W.2d 905, 907.

We hold that the evidence is legally sufficient to support the jury's answers to Special Issues Nos. 19 and 20.

Appellants contend that the jury findings in question are against the great weight and preponderance of the evidence. A critical sifting, more than once, of all of the evidence convinces us that it is factually sufficient to support the findings.

After due consideration, plaintiffs' remaining points and contentions are overruled.

The judgment is affirmed.