Alba ORTIZ, Appellant,

v.

ALLERGAN PHARMACEUTICALS,
Appellee.

No. 713.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

Dec. 20, 1972.

Rehearing Denied Jan. 17, 1973.

**136**

John H. Holloway, Houston, for appellant.

Gay C. Brinson, Jr., Vinson, Elkins, Searls, Connally & Smith, Houston, for appellee.

BARRON, Justice.

This suit was filed by Alba Ortiz as plaintiff against Allergan Pharmaceuticals, Dr. Edmund L. Burnett and Jones Apothecary, Inc., all defendants, alleging malpractice, negligence, breach of warranty, and strict tort liability. Plaintiff sought damages as a result of injury to her eyes allegedly sustained after prolonged use of prescription eyedrops known as Prednefrin 0.12%. The eyedrops were prescribed by Dr. Edmund Burnett, dispensed on each occasion by Jones Apothecary, and manufactured and placed on the market by Allergan Pharmaceuticals.

During the trial, plaintiff settled with Dr. Burnett and Jones Apothecary, and took a non-suit as to them, reserved her action against Allergan and released Dr. Burnett and Jones Apothecary, granting to the latter two defendants an indemnity agreement in the usual form. Each party defendant alternatively sought indemnity and contribution against the others. The trial continued against Allergan as did Allergan's cross-action for indemnity and contribution against Dr. Burnett and Jones Apothecary. After a jury verdict, the trial court entered judgment for Allergan and ordered that the original parties defendant take nothing by reason of their cross-actions for indemnity and contribution. This appeal has been perfected by Alba Ortiz, plaintiff, against Allergan Pharmaceuticals, and she will hereafter usually be designated as appellant.

The jury found no meaningful special issues in favor of appellant. It found (1) that prior to September 21, 1966 Allergan did not know, or in the exercise of ordinary care should not have known, that Prednefrin 0.12% could produce posterior subcapsular cataracts in a person using it over an extended period of time; (2) that Allergan was not negligent in failing to withdraw the drug from the market prior to September 21, 1966 after it knew, or in the exercise of ordinary care should have known, that the

drug could cause posterior subcapsular cataracts when used over an extended period of time; (3) that the drug was not unfit by reason of the claimed fact that it could produce posterior subcapsular cataracts even if used as directed by the manufacturer; (4) that the package insert and Allergan's medical advertisements did not fail sufficiently to warn the medical profession, druggists, and consumers as to the possible side effect of posterior subcapsular lenticular opacities or cataracts allegedly inherent in such drug; (5) that prior to September 21, 1966 Allergan did not represent to the medical profession and patients that the drug was fit for use for more than three weeks without risk of damage when used as an eyedrop two or three times per day in treatment of allergic conjunctivitis and non-infectious allergic and inflammatory eye disorders; (6) that prior to July 5, 1967 Allergan failed to warn the medical profession that posterior subcapsular lenticular opacities or cataracts attributable to Prednefrin 0.12% by reason of the steroid content therein were reported spontaneously to disappear or regress within ten months to three years after ceasing use of such drug; (This special issue (number 15) was answered favorably to appellant, but the jury found the following two special issues (numbers 16 and 17) dealing with negligence and proximate cause in favor of appellee.) (7) that the drug was marketed with adequate testing for safety; (8) that Allergan did not fail to exercise ordinary care to warn the medical profession or users of its product that the drug allegedly could produce a sufficient rise in intraocular pressure to cause permanent damage to the eye in persons using the drug in excess of three weeks by placing 1 to 2 drops in the conjunctival sacs two to four times a day; (9) that Allergan did not over-promote use of the drug as a safe drug in allergic conjunctivitis; (10) that there were no damages resulting from the use of Prednefrin 0.12%; (11) that the cataracts which appellant developed were an abreaction to Prednefrin 0.12%, meaning one which could not have been reasonably foreseen in an appreciable class or number of potential users prior to September 21, 1966; (12) that the state of medical knowledge was not such that Allergan could reasonably have discovered that the drug might cause cataracts in an appreciable class or number of potential users prior to September 21, 1966. The above special issues in substance are numbered from 1 to 29 inclusive. In all, 47 special issues were submitted under the evidence and pleadings, particularly for possible indemnity and contribution. The jury found that Jones Apothecary, Inc. refilled the prescription for the drug for appellant on many occasions without authorization by Dr. Burnett at the time of refilling; that such was a misuse of the product; and that such acts were negligence which proximately caused appellant's injuries. Also, the jury found that Dr. Burnett did not authorize Jones Apothecary, Inc. to refill the prescriptions between April 20, 1965 and September 15, 1966. Finally, the jury found that appellant's use of the product between the above dates constituted a misuse of same and that such misuse by appellant was a proximate cause of the injuries suffered by appellant, Alba Ortiz.

Appellant has brought forward 71 points of error, in general presenting no evidence, overwhelming weight, and insufficient evidence points; and further that certain facts and issues were established as a matter of law; that the trial court gave certain erroneous definitions; that certain expert testimony was inadmissible; and other matters.

The record shows that on or about February 5, 1965 Mrs. Ortiz consulted Dr. Burnett, an ophthalmologist, who fitted her with glasses, diagnosed conjunctivitis and prescribed Prednefrin 0.12% eyedrops, manufactured by Allergan. She had a refractive area consisting of myopia, combined with some astigmatism (faulty vision caused by an abnormal curvature in the eye), and an inflammatory condition of the eye called conjunctivitis. Her visual acuity unaided was 20–30 in each eye, a

minor refractive error. The doctor saw no future trouble. On the above date the doctor gave appellant a small 2cc bottle of the involved drug. On March 11, 1965 the pharmacist at Jones Apothecary called and asked the doctor for permission to fill two bottles of the above drug. Dr. Burnett allowed appellant to have them, because she wanted one bottle for home and another for her office. The doctor gave no permission for any future refills. His instruction to the pharmacist was for the patient to use the drug when necessary and not more than every four hours. After the authorization had expired appellant continued to call Jones Apothecary for refills. From April 20, 1965 to September 15, 1966 appellant had Jones Apothecary refill the prescription about seventeen times. The drops were dispensed with a Jones Apothecary label and the doctor's directions for use, but without Allergan's package insert. Prednefrin 0.12% has been on the market since 1957. It is an admittedly pure drug, the principal ingredient of which is a steroid, Prednisolone Acetate. It is a prescription drug which is prohibited by law from being dispensed except on the written prescription of a licensed physician. Increased intraocular pressure is and was a known side effect in susceptible persons, and it is undisputed that extended or prolonged use should be allowed only when there is direct supervision by a medical doctor. It is also undisputed that Mrs. Ortiz had no such medical supervision. In fact, appellant saw Dr. Burnett only the one time in February, 1965.

Mrs. Ortiz testified that she could not read comfortably. She got tremendous headaches when she read for more than one hour. She had conjunctivitis chronically in both eyes. In January 1966 appellant was hospitalized for several days in Methodist Hospital for migraine headaches. No detailed examination of her eyes was done. In September 1966 she got a glaucoma test and was advised to consult an ophthalmologist. Later in September of that year she consulted Dr. Daily, an ophthalmologist, who found that she had increased intraocular pressure and corneal edema. She had glaucoma and subsequently developed cataracts. Dr. Daily treated appellant and extracted her cataracts in July 1967. At the time of trial, appellant had some loss of peripheral vision and wore contact lenses.

Dr. James Stuart Cumming, an ophthalmologist employed by appellee, is a medical director for the Contact Lense Division and director of clinical research for Allergan. He testified that Prednefrin 0.12% was approved by the Federal Food and Drug Administration. The average treatment with the drug is two to four weeks, and that adverse or side reactions are negligible. The drug is not to be used for a period in excess of six weeks and for the majority of the people for less than four weeks. The manufacturer's testing results were good. The doctor knew that the drug could cause increased intraocular pressure if administered for prolonged periods of time to susceptible persons, and that the drug *could not* damage anybody's eyes in three weeks unless it was improperly used. Over a million bottles of the drug had been dispensed by 1965 without any report of cataracts. However, the drug can cause a rise in intraocular pressure and cataracts if it is misused. If topical steroid is put in the eyes for a prolonged period of time, about 30% to 33% of the users will receive intraocular pressure. There is little, if any, evidence of development of cataracts. If such occurs, it is an abreaction, that is to say a reaction which could not have been reasonably foreseen and which would be an unusual or abnormal result.

We hold that the controlling issues submitted to the jury were supported by competent evidence as against this appellee, probably by the testimony of Dr. Burnett and Dr. Cumming alone. It is our duty in this type of case, where the jury has made findings of fact and judgment has been rendered in favor of appellee, to af-

firm the findings of the jury and the judgment of the trial court and not substitute our judgment for that of the jury or the trial court, even though we might have reached a wholly different conclusion, unless we are convinced that the evidence in the record shows the jury verdict to be so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust or the evidence entirely insufficient to support the findings of the jury and the judgment of the trial court. Continental Bus System, Inc. v. Biggers, 322 S.W.2d 1 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.). We must in all cases of this type view the evidence in the light most favorable to the judgment. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951). We further hold that the verdict is not against the great and overwhelming weight and preponderance of the evidence.

At least between April 1965 and July 1966 the package insert and warning given by appellee were as follows:

"Warning: (1) In diseases due to microorganisms, infection may be masked, enhanced or activated by the steroid. (2) Extended use may cause increased intraocular pressure in susceptible individuals. It is advisable that the intraocular pressure be checked frequently. (3) In those diseases causing thinning of the cornea, perforation has been known to have occurred with the use of topical steroids. (4) Since PREDNEFRIN contains no anti-microbial, if infection is present appropriate measures must be taken to counteract the organisms involved. (5) Should be used with caution in the presence of narrow angle glaucoma. (6) If sensitivity to any of the constituents of this medication is present or develops, it should not be used, or it should be discontinued immediately."

Dr. Burnett testified that with the knowledge available at the time, the 1966 package insert warning was adequate, and that the package insert for 1965 and 1966 gave a reasonable warning for that period of time. Allergan had no record of anyone developing a cataract from the use of the drug after having distributed over three million bottles in the last ten to fifteen years. Dr. Cumming testified, in his opinion, there was not sufficient evidence to justify a warning on the package insert as to the possibility of cataracts. Most, at least, of Mrs. Ortiz's refills by Jones Apothecary, were without the above warning contained in the package inserts provided by appellee.

Needless to say, the jury findings convicted Jones Apothecary, Inc. of negligence in refilling the prescription of Prednefrin 0.12% for appellant and in misusing the product, which proximately caused the injuries to appellant's eyes. We need not consider the sufficiency, legal or factual, of the jury's findings in special issues numbers 46 and 47 pertaining to appellant's misuse of the drug. Appellant had, during the trial, settled with Jones Apothecary, Inc. for the sum of $125,000.00 and with Dr. Burnett for $10,000.00.

The first 27–30 issues determined Allergan's liability. All inquiries, with the exception of the above where no negligence was found, were determined by the jury in favor of Allergan, which means in law that appellant failed to carry her burden of proof as against appellee. C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 194 (Tex.Sup.1966); Erving v. Reistino, 448 S.W.2d 707, 710–711 (Tex.Civ. App.-Waco 1969, writ ref'd n. r. e.); Marsh v. Arnold, 446 S.W.2d 949, 950–951 (Tex. Civ.App.-Houston (14th Dist.) 1969, writ ref'd n. r. e.). The burden of proof was on appellant-plaintiff. According to the jury verdict Mrs. Ortiz, appellant, failed to discharge the burden of proving the controlling facts as against Allergan Pharmaceuticals, the appellee.

Again, we must apply the Supreme Court case of Southern Pine Lumber Co. v. An-

drade, 132 Tex. 372, 124 S.W.2d 334 (1939) and many cases following the rule, under the circumstances of this case though appellant vigorously objects to such decision. The jury found that no damages were sustained by Mrs. Ortiz resulting from the use of the involved drug. It is not for this Court to alter the rule of Andrade.

■ An expert witness' opinion may be based at least in part upon hearsay, and such does not render his opinion inadmissible. Commercial Standard Ins. Co. v. Cisco Ind. Sch. Dist., 435 S.W.2d 565, 568 (Tex.Civ.App.-Eastland 1968, writ ref'd n. r. e.); Bryant v. Trinity Universal Insurance Company, 411 S.W.2d 945, 952–953 (Tex.Civ.App.-Dallas 1967, writ ref'd n. r. e.). We see no objection to the testimony of the expert witnesses in this case. No controlling facts were proven as a matter of law as contended by appellant. Usually, no testimony of an interested witness or an expert witness can establish any material fact as a matter of law. See Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345 (1948).

■ All controlling special issues having been answered by the jury relating to appellee's alleged primary negligence and liability in favor of Allergan Pharmaceuticals, appellee, and based upon sufficient evidence, any error in the manner of submitting other special issues, definitions, contributory negligence, etc. becomes harmless. Brown & Root v. Haddad, 142 Tex. 624, 180 S.W.2d 339, 342 (1944); Henry v. American Airlines, Inc., 413 S.W.2d 123, 128–129 (Tex.Civ.App.-Eastland 1967, no writ).

We have considered all contentions made by appellant, and each is overruled.

The judgment of the trial court is accordingly affirmed.